[Civ. No. 3110. Fourth Dist. Jan. 25, 1944.]

W. G. BRADFORD et al., Appellants, v. SOUTHERN CALI-
FORNIA PETROLEUM CORPORATION (a Corpora-
tion) et al., Respondents.

Sidney J. W. Sharp, M. Wingrove, Fleming & Robbins and C. S. Tinsman for Appellants.

Reynolds & Painter, Thos. Reynolds, Howard Painter, Roger R. Walch, A. L. Weil, Martin J. Weil, J. M. Jessen and J. G. Covert for Respondents.

GRIFFIN, J.—This is an action for reformation of a contract. The contract sought to be reformed was entered into by and between the plaintiff W. G. Bradford and the defendant Southern California Petroleum Corporation, hereinafter referred to as "Southern." The plaintiff Johanna Bradford is the wife of W. G. Bradford. The plaintiff Republic Petroleum Company, hereinafter referred to as "Republic" is the successor in interest of the plaintiffs W. G. Bradford and Johanna Bradford. The defendant General Petroleum Corporation of California (hereinafter referred to as "General") is the assignee, with respect to certain oil leases, of the defendant Southern.

About 1932, Bradford entered into the business of independent oil lease broker. About 1939, he became interested in the Helm-Amerada area (the field which is involved in this action). He and one Goodrich obtained signatures of various landowners in the area on what purported to be options to lease the lands of such owners for oil. These instruments were designated "Contract and Agreement to Lease for Oil and Gas." These so-called options provided, among other things, that Bradford would assign them to a responsible oil company with sufficient finances to carry out the terms of the oil leases. Practically all of the so-called options had been signed by the landowners prior to May 1, 1939. From May, 1939, to the latter part of June, 1940, Bradford unsuccessfully approached many persons and firms in an endeavor to sell his rights in the so-called options. In June, 1940, Bradford approached Southern with a view of selling these options to it. The matter was orally discussed between Bradford and the officers of Southern, and the latter advised Bradford of the conditions under which they would enter into the deal. Their oral understanding or agreement was evidenced by a letter memorandum dated June 28, 1940, directed to Bradford, which in substance recited that:

"The purpose of this letter is to set down in writing and to confirm our verbal agreement made this day regarding

certain lands now under contract to be leased to you in Fresno and Kings counties (described by townships). . . .

"It is hereby understood and agreed that all acreage now under contract to you to be leased or additional lands which may be contracted for in the above-mentioned townships are to be leased to us as your nominee under said contract, subject to the following conditions of agreement between yourself and the Southern. . . .

"We are to furnish the necessary expenses to you for traveling and incidental expenses necessary to you for these leases drawn and placed in escrow . . . We also agree to pay for all title charges involved and to make the payments necessary for lease rentals on all leases taken.

"It is understood and agreed that we are to be in full charge of the handling and disposal of all leases taken, at all times; that in consideration of your entering into this agreement, we are to pay you the sum of four thousand dollars ($4,000.00). . . .

"It is further understood and agreed that we are to divide on a fifty-fifty (50-50) basis all cash bonuses and overriding royalties received by us, when, as and if any of the leases involved are sold and assigned to other operators or operating companies, with this proviso, however, that we are first to receive the sum of four thousand dollars ($4,000.00) after it has been paid to you as consideration or whatever amount has been paid plus whatever expenses we have paid to you for your work in getting the leases executed before any 50-50 division of profits shall operate.

"It is further understood and agreed that on all leases involved in this agreement there must be at least a minimum of one-half of one per cent ($\frac{1}{2}$ of 1%) gross overriding royalty retained for the benefit of W. G. Bradford or his nominee. This one-half per cent ($\frac{1}{2}$%) gross overriding royalty shall be deducted from the total gross overriding royalty before a 50-50 division of overriding royalty shall take effect.

"It is further understood and agreed that at any time Southern . . . may select parcels of acreage to be held by them for their own account, and to be taken out of and away from the pooled acreage, provided, that they shall deliver to W. G. Bradford one-half of one per cent ($\frac{1}{2}$ of 1%) gross overriding royalty on such acreage withdrawn; and shall also allow him to select a like amount of acreage from the pooled acreage for his own account; it being understood and

agreed that ½ of 1% gross overriding royalty is to be paid to Southern . . . on any leases so selected by him.

"It is further understood and agreed that in connection with the above paragraph, Southern . . . shall have an option, good for ninety (90) days, to buy any leases selected by W. G. Bradford, under the above-mentioned paragraph, paying him a consideration of five dollars ($5.00) per acre, plus two per cent (2%) gross overriding royalties. . . .

"It is further agreed that this is a temporary memorandum letter of agreement, setting forth a rough outline of the terms and conditions of our understanding, and that in due course a proper form of contract shall be drawn and entered into by the parties concerned.

"If this letter sets forth the terms and conditions of the agreement as understood by you, kindly affix your signature on the carbon copy of this letter in the place provided. . . .

 (Signed) "Southern California Petroleum Corporation,
 "By Robert Shlaudeman, President.

"I hereby approve and accept the above letter of agreement, and also acknowledge receipt of the sum of five hundred dollars ($500.00) paid to me" on account.

 (Signed) "W. G. Bradford."

The "formal contract" executed as of June 28, 1940, then provided in more elaborate terms, that:

". . . Bradford did heretofore execute and enter into certain contracts with various owners of real property. . . .

"Now, therefore, it is agreed as follows:

"1. Bradford does hereby assign . . . unto Southern . . . all of the contracts above described. . . .

"2. Bradford further agrees that if he shall at any time within six (6) months from the date hereof execute any other contracts . . . Bradford will . . . assign . . . unto Southern . . . any and all such contracts. . . .

"3. All leases executed . . . shall be executed by and between the respective landowners as lessors and Southern . . . as lessee. . . .

"4. Bradford shall devote his time and attention exclusively to the work of securing and the execution of leases in favor of Southern. . . .

"5. Southern . . . shall pay all reasonable traveling and other expenses of Bradford . . . and shall make payment of rentals under all leases. . . .

"6. In consideration of the assignment of said contracts by Bradford to Southern . . . and of the services performed

by Bradford hereunder, Southern . . . agrees to pay to Bradford the total sum of four thousand dollars. . . .

"7. It is understood and agreed that all of said leases shall belong solely to Southern . . . and Southern . . . shall have the right to . . . develop, dispose of, or otherwise . . . surrender or abandon all or any of said leases in such manner and at such time or times and upon such terms and conditions as it shall in its sole discretion determine; provided that in any disposition of said leases there will be reserved and retained with respect to each lease a gross overriding royalty for the benefit of Bradford, or his nominee, of at least one half of one per cent (½ of 1%) of all oil, gas and other hydro-carbon substances produced, saved and sold from the premises covered thereby.

"8. If and when Southern . . . shall dispose of said leases, or any thereof, or any interest therein, and shall receive cash bonuses, and/or shall reserve overriding royalties in any such transactions, then Southern . . . shall be entitled out of such bonuses and/or royalties, to reimburse itself, first, in the amount of $4,000.00 representing the monies paid to Bradford . . . and second, in an amount equal to all of the escrow, title, traveling and other expenses paid out by Southern . . . in connection with obtaining said leases except rental monies; and after Southern . . . shall have been fully reimbursed as aforesaid, and after deducting the one half of one per cent (½ of 1%) gross overriding royalty interest of Bradford hereinabove provided for in paragraph 7 hereof, then all remaining cash bonuses and/or overriding royalties shall be divided equally between Bradford and Southern. . . .

"9.(a). Anything herein notwithstanding, Southern . . . shall at any time or from time to time be entitled to select and designate for its own account and use any parcel or parcels of land covered by said leases, or any thereof, up to but not exceeding in area one-half (½) of the lands held under said leases. In such event the leases covering the lands so selected shall thenceforth be owned by and held, retained, used and/or disposed of for the account of Southern . . . and Bradford shall have no right to share in or receive any part of the cash bonuses, overriding royalties or other returns or avails received by Southern . . . with respect to the lands so selected and designated or the leases covering the same, excepting only that Bradford shall nevertheless receive with respect to any such lands said one-half

of one per cent (½ of 1%) gross overriding royalty . . ."
herein provided.

"(b). In the event that Southern . . . shall at any time make such selection and designation of lands for its own account, then Bradford shall forthwith in each case be entitled to select and designate for his own account and use lands covered by said leases of an area equivalent to those so selected by Southern . . . In such event the lease or leases covering the lands so selected shall be assigned to and shall thenceforth be owned by and held . . . for the account of Bradford, and Bradford shall assume and be solely responsible for and shall protect and save Southern . . . harmless from all payments and obligations of the lessee thereunder, and Southern . . . shall have no right to share in or receive any part of the cash bonuses, overriding royalties or other returns or avails received by Bradford with respect to such lands so selected by him, and shall not be liable for any payments or obligations of the lessee therein, excepting only and provided that Southern . . . shall in each case receive and be paid a gross overriding royalty of one-half of one per cent (½ of 1%) of all oil, gas and other hydrocarbon substances produced, saved and sold from such lands.

"(c) If Bradford shall select any lands for his own account as hereinabove provided in subparagraph (b), then it is understood and agreed that Southern . . . shall have, and Bradford does hereby grant to Southern . . . the exclusive right and option for a period of ninety (90) days after such selection and designation by Bradford, to purchase the lease or leases covering any and all lands so selected by Bradford at a price of five dollars ($5.00) for each acre of land, plus a gross overriding royalty to Bradford of two per cent (2%) of all of the oil, gas and other hydrocarbon substances produced, saved and sold from such lands. Such option shall be exercised by notice in writing to Bradford within said ninety (90) day period. . . .

"(d) Any selection and designation of lands by the respective parties hereto as provided for in this paragraph 9 shall be made by notice in writing. . . .

"11. Nothing herein shall be construed to give Bradford any right, title or interest in or to any of said leases, or the leasehold estates thereby created, or the lands covered thereby, excepting only the leases which may be selected by Bradford for his own account as provided in paragraph 9 hereof, and excepting the royalties herein provided to go to Brad-

ford; it being understood and agreed that Southern . . . is the sole owner of said leases, and Bradford's only right is to receive the payments and/or royalties herein provided for and to compel performance of this agreement. . . .

"14. This agreement is executed for the purpose of superseding, and it does supersede a temporary memorandum agreement heretofore executed by the parties hereto of even date herewith and this instrument constitutes and contains the entire agreement between said parties."

Pursuant to this understanding, Bradford did procure leases for Southern, and subsequently Southern, acting under the provisions of the contract, selected certain acreage for its own. Such selection was made in accordance with the provisions of the formal contract by a "NOTICE OF SELECTION OF LANDS," dated 11/18/41. Thereafter, Southern sold some of this acreage to the defendant General. On October 31, 1941, a well was brought in on land in the immediate vicinity of the pooled acreage. About this time, Bradford sold and assigned his interest in the contract to Republic, after which the present action was instituted to reform the formal contract in accordance with the claimed first oral agreement and the letter memorandum agreement. After Southern had selected certain lands as above set forth Bradford failed to make any selection. On December 18, 1941, Southern served written notice on Bradford and Republic, calling their attention to the fact that Bradford was entitled, under the formal contract, forthwith to make selection for his own account, and advised him that unless he made his selection within a reasonable time after Southern's selection, Bradford's right of selection would expire. Under the terms of this notice Bradford was further advised that Southern intended to exercise its option to purchase lands which Bradford might select, as provided in the formal contract. This is a general picture of the facts of the case. Additional details will be brought out later in discussing the points raised on this appeal.

Section 3399 of the Civil Code provides three grounds for the reformation of contracts: (1) fraud; (2) mutual mistake of the parties; and (3) a mistake of one party which the other at the time knew or suspected. The original complaint filed in this action on January 3, 1942, set forth only the third ground above mentioned. It was there alleged that Southern told Bradford, who it is alleged was inexperienced in busi-

ness transactions and legal matters, that the formal contract contained a true statement of their oral agreement; that in fact it did not conform to the true agreement, and that Bradford signed the same under the mistaken belief that it did conform thereto, which mistake was known to Southern.

On May 25, 1942, more than five months later, plaintiffs, with leave of court, filed an amendment to the complaint which sets up a second cause of action. This cause of action likewise seeks reformation of the formal contract, but such reformation is sought not on the ground of unilateral mistake, but on the ground of fraud. Substantially the same facts are alleged in the amendment to the complaint as in the original complaint, but they are alleged in a different manner. At or about the conclusion of the trial, the plaintiffs chose to add one paragraph to the second cause of action and they did so by an amendment which, for the first time, set forth the existence of a joint venture between Bradford and Southern with respect to all of the leases involved. The plaintiffs ask that the formal contract be reformed and then enforced as reformed, and that the plaintiffs be adjudged to be the owners of an undivided one-half interest in all the leases obtained through the efforts of Bradford, and that the assignments of the leases to defendant General Petroleum Corporation be set aside.

The main issue in the case is whether or not the plaintiffs, under the undisputed evidence, are entitled to a reformation of the formal contract as a matter of law.

The court found that it was not true that Bradford was inexperienced in business transactions or legal matters, but that on the contrary he had, since 1932, actively and solely engaged in, and was experienced in the business of dealing in oil and gas leases and was experienced in the legal aspects thereof; that all the transactions and dealings between the parties were not of such a nature as to establish a confidential or fiduciary relationship; that the letter memorandum was jointly prepared by Bradford and Southern and expressed their understanding in the negotiations which had preceded the preparation and execution of such memorandum; that pursuant to the terms of that letter memorandum and the oral understanding and agreement of the parties, the letter memorandum was delivered to Southern for the purpose of preparing the formal contract; that thereafter the formal contract was prepared and was read and discussed

between the parties; that corrections, deletions and additions thereto were made at the request of both Bradford and Southern, and subsequent thereto a final draft was prepared and executed by them; that all the negotiations between the parties were fairly and honestly conducted and that the formal contract incorporated therein all òf the terms and conditions of the letter memorandum; that the formal contract expressed the true intent, meaning and understanding of the parties thereto as to the terms, covenants and conditions of their said agreements; that at all times both parties to the agreements understood them; that the terms of the agreements embodied all of the preliminary negotiations had between the parties thereto, and no terms or covenants were omitted therefrom; that no misrepresentations as to the meaning of any of the terms or conditions in the agreements or the legal import thereof were made by defendant Southern; that no fraud was perpetrated on Bradford by defendant Southern; that after the execution of the agreements, and with full knowledge of the terms and conditions thereof and the legal import and true meaning thereof, and under the terms of the formal contract, Bradford negotiated for and procured the execution of certain oil and gas leases from landowners in the name of Southern as lessee; that at all times said leases stood in the name of defendant Southern except those certain leases purchased by defendant General; that at all times Bradford knew that Southern was holding itself out to be the sole and exclusive owner of the leases with full power to deal with them in such manner as defendant Southern should in its discretion determine, except as to the terms and conditions set forth in the formal contract; that during all of that period of time between the date of the execution of the written agreements and the date of filing the complaint, Bradford voiced no objection to the fact that the leases were in the name of Southern, and by his acts and conduct led others, and particularly defendant General, to believe that Southern was the sole and exclusive holder and owner of the leases; that by their acquiescence therein and by their failure to object thereto, they ratified and confirmed the conduct on the part of Southern; that General purchased from Southern certain of the leases for a consideration of $85,821, and other valuable consideration in good faith, without notice of any claims or purported claims on the part of plaintiffs;

that notice of selection of land was duly and regularly given pursuant to the terms of the formal agreement, and that Southern was and now is the sole and exclusive owner of the leases set forth in the notice of selection of lands, free and clear of any claim of plaintiffs, save and except the overriding royalties reserved under the formal contract; that General was a bona fide purchaser for value of the leases and leasehold estates; that plaintiffs, by their acts and conduct, are estopped from asserting any claim or claims to any of the leases except the overriding royalties reserved; that plaintiffs have been guilty of laches by reason of their failure to assert their alleged claims within a reasonable period of time; that most of the allegations of plaintiffs' complaint were found to be untrue; and that plaintiffs are not entitled to any judgment against the defendants or either of them. Judgment was entered accordingly.

Appellants now argue (1) that the formal contract does not conform to the true agreement of the parties as evidenced by their conversations and the letter memorandum, and that under such circumstances the court should have reformed the contract; (2) that General having acquired the leases from Southern with full knowledge of appellants' rights, holds title subject thereto; (3) that the agreement was one of common enterprise for the benefit of both parties in the nature of a joint venture and that defendants are required to account thereunder; and (4) that the evidence does not support the findings.

We will first discuss the main question here involved as to whether the findings are supported by the evidence. We have examined the reporter's transcript of the testimony containing 2,158 pages in respect to the claimed oral conversation between Bradford and the officers of Southern. Bradford claimed that he did not intend to allow Southern to take one-half of the acreage in one selection and leave him to select only from the remainder; that it was his understanding that he was to have a one-half interest in the entire transaction, i. e., he told Southern "All I want is a 50-50 deal out of this and you draw up any kind of a paper you want to that effect and I will sign it." Defendants' agents' testimony contradicted that evidence, and one testified that "I did not hear anything about a 50-50 deal at all." The testimony in respect to the oral conversation was conflicting in many respects. Even plaintiffs, in their brief, agreed with

this conclusion. It is there said: ''The evidence introduced was conflicting as to conversations during the negotiations between Bradford and the officers of the Southern California Petroleum Corporation.'' In this respect we are bound by the time-honored rule governing our duty on appeal. It is not sufficient upon appeal to point out, or even demonstrate to this court, that the judgment is against the preponderance of the evidence, or that upon the same evidence other persons would come to a different conclusion. If there is any substantial evidence upon which the court could have found its judgment it must be upheld. (*Meyer* v. *Great Western Insurance Co.*, 104 Cal. 381 [38 P. 82]; *City of San Diego* v. *Cuyamaca Water Co.*, 209 Cal. 152 [287 P. 496].)

The written letter memorandum specifically provided that Bradford accepted the terms of the agreement as therein set forth; that the letter was for the purpose of setting down in writing ''and to confirm'' the oral agreement. As a general rule, all prior negotiations and stipulations concerning the subject matter of a contract are considered merged therein when the contract is executed. (Sec. 1856, Code Civ. Proc.; 6 Cal.Jur. p. 380, sec. 229.)

 The main question then is whether the formal contract contained the agreement of the parties on the subject matter. Most of the provisions of the letter memorandum were, in effect, contained in the formal agreement. It was agreed that the formal agreement might contain other provisions and might elaborate upon the general terms expressed in the letter memorandum. From a reading of the formal agreement it appears that the method of selection of the leases adopted by Southern was permissible under its terms. The trial court was justified in holding that this was the method agreed upon although Bradford argued that it was his intention that the agreement would provide that the acreage was to be divided into 80-acre parcels and that Southern might make the first selection of 80 acres, Bradford the next, and so alternating in a ''checker board'' fashion until the entire selection was completed. The formal agreement, when considered as a whole, clearly disproves any contention that the venture was a joint venture in which Bradford was to participate on a 50-50 basis, even though the letter memorandum does refer to some 50-50 basis of division of cash bonuses and overriding royalties if and when the leases in-

volved might be sold to other operators. The formal agreement itself provided that it was "executed for the purpose of superseding" the temporary letter memorandum and "contains the entire agreement between said parties." Bradford had ample opportunity to examine its provisions. As a matter of fact he suggested and made certain changes in it before it was signed. If Bradford had intended that it should have contained provisions for a 50-50 division of the proceeds realized under its operation so as to constitute a joint venture or that the provisions thereof were inconsistent with his intentions in other respects, the burden was upon him to convince the trial court of those facts. We must presume that the trial court fully weighed and considered the evidence on this subject. We are unable to disturb the trial court's finding that the formal contract should not be reformed in accordance with plaintiffs' suggestions even though plaintiffs' suggested plan of selection and division of profits may now appear to be more equitable. (*Tide Water Associated Oil Co.* v. *Curtin*, 41 Cal.App.2d 884 [107 P.2d 945].) This was a question for the determination of the trier of facts. When the trial court finds on such a question, and there is substantial evidence to support it, this court, on appeal, may not weigh the evidence and substitute a different finding. (*Chichester* v. *Seymour*, 28 Cal.App.2d 696 [83 P. 2d 301].)

The only finding necessary to support the judgment denying the prayer for reformation of the contract was that its terms were identical with those that had been agreed upon by the parties, and other findings not necessary to the judgment or on immaterial issues need not be made. (*Burke* v. *Meyerstein*, 94 Cal.App. 349 [271 P. 343]; and the same case in 193 Cal. 105 [222 P. 810].) The findings of the trial court are supported by the evidence.

This determination automatically disposes of the question whether the General acquired its leases from Southern in good faith, for a valuable consideration and without notice of plaintiffs' claim.

Finally, objection is made to the fact that the trial court signed defendants' proposed findings before the lapse of five full days after service, as provided in section 634 of the Code of Civil Procedure. The findings were served on December 18, 1942, and signed on December 23, 1942. In support of this objection plaintiffs cite *Estate of Pala*, 55

Cal.App.2d 647 [131 P.2d 593], where it was said: "The court may not adopt or sign findings 'prior to the expiration of five days after such service. . . .'" Construing that section before its amendment in 1933, its provisions have been held to be directory and not mandatory. (*Hammond Lumber Co.* v. *Henry*, 87 Cal.App. 231 [261 P. 1027] [hearing denied by the Supreme Court].) See, also, *Treat* v. *Superior Court*, 7 Cal.2d 636 [62 P.2d 147], in which case, construing that section subsequent to the 1933 amendment, the Supreme Court held that the provision directing a party to prepare findings and that a copy of the proposed findings should be served upon the parties at least five days before they are signed, is merely directory and not mandatory, and that the failure of a party to serve the opposite party with a copy of the proposed findings of fact and conclusions of law is not a statutory ground for setting aside or vacating a judgment. This question was presented to the trial court on a motion for new trial, which motion was denied. We therefore conclude that the signing of the findings on the fifth day did not prejudice plaintiffs nor impair the validity of the judgment subsequently entered.

Judgment affirmed.

Barnard, P. J., and Marks, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied March 23, 1944.