[Civ. No. 16916. Second Dist., Div. Three. Dec. 22, 1949.]

C. L. CHAMBERLAIN et al., Appellants, v. LEON R. WAKEFIELD et al., Respondents.

Hanifin & Sease for Appellants.

E. O. Leake, J. J. Leake and Archie G. Cope for Respondents.

WOOD, J.—Plaintiffs, who are husband and wife, were lessees of the Oxford Hotel in San Pedro, and were owners of the furniture therein. The defendants Wakefield, who are brother and sister, purchased the lease and furniture from plaintiffs for $28,500; and at the time of the transaction, and in payment of said sum, they paid $5,000 in cash, transferred a $7,500 equity in a ranch in Oregon, and executed a promissory note for $16,000. Defendants Landers, who are husband and wife, were the owners of the hotel, and they consented in writing to the assignment of the lease by plaintiffs to the Wakefields.

Plaintiffs commenced this action against the Wakefields upon the promissory note; and later they amended the complaint to include an alleged cause of action for damages for alleged conspiracy, on the part of the Wakefields and the Landers, to defraud plaintiffs. Defendants Wakefield filed a cross-complaint for rescission or, in the alternative, for

damages, and alleged that they were induced to enter into the agreement by reason of the false and fraudulent representations of plaintiffs.

The court found that the Wakefields were induced to enter into said contract of sale, and to pay the $5,000 and transfer the real property and execute the note, by reason of false and fraudulent statements and representations made by plaintiffs to defendants Wakefield, as follows: that the lease and furniture were of the reasonable value of $28,500; that the gross income for the past year had averaged $2,750 per month; that the net income had averaged $1,500 per month; that the net profit for the past year was $18,000. The court also found that the Wakefields, immediately upon ascertaining the falsity of said statements and representations, rescinded said transaction and offered to return to plaintiffs everything of value received by them; that plaintiffs refused such rescission and offer; that at the time of service of the notice of rescission the Wakefields were not in default under the terms of the lease, contract of sale, or the note. The court concluded that the Wakefields were entitled to have the rescission enforced.

The judgment was that plaintiffs deliver to the Wakefields a good and sufficient deed to the real property in Oregon; that the promissory note be and "is hereby cancelled"; that the contract of sale for the furniture entered into between plaintiffs and the Wakefields be cancelled; and that the Wakefields have judgment for $4,804.69 (that being the difference between the sum of $5,000 paid to plaintiffs by the Wakefields and a deduction of $195.31 to which the court determined plaintiffs were entitled after taking an accounting of the income and expenses of the hotel while it was in possession of the Wakefields and the income and expenses of the ranch while it was in possession of the plaintiffs). The judgment also provided that defendants Landers recover their costs from plaintiffs. Plaintiffs appeal from the judgment and from the order denying the motion for a new trial.

Appellants contend that the evidence does not support the finding of fraud; and that the evidence does not support the finding that the lease and plaintiffs' interest in the furniture were of no value.

In 1943, the defendants Landers leased the hotel (which had 56 rooms) to one Story for $750 per month, and the lease provided that it should not be assigned without the written consent of the lessors. About May 14, 1946, the plaintiffs became

the owners of the lease by an assignment. Plaintiffs also purchased the furniture in the hotel, subject to a chattel mortgage which was held by the Landers as security for the performance of the covenants of the lease. Thereafter the plaintiffs placed a second mortgage on the furniture to secure the payment of a note, in the approximate amount of $5,800, to one Seagle.

About December, 1946, plaintiffs listed the lease and furniture for sale with a real estate broker in Los Angeles. About March 8, 1947, Mrs. Chamberlain informed the broker (with whom she had listed the lease and furniture for sale) that the gross income from the hotel was $2,750 per month, that the expense of operation was about $1,250, and the net income was about $1,550. The following day she signed the broker's listing card on which that information was written. It was also stated thereon that the selling price was $28,500. Thereafter, during March, 1947, Miss Wakefield, who at that time was a real estate broker in Seattle, went to the office of the real estate broker in Los Angeles and told him she was looking for a location in California. He told her about the Oxford Hotel, and gave her the information contained on the card above mentioned. Miss Wakefield then went to the hotel where she met Mrs. Chamberlain, and Mrs. Chamberlain told her "that she made from 2750 to 3500," on the hotel and "she had averaged around 3000,"—that "she would always net $1500 a month," and she "cleared $18,000 the first year she was in the business." Mrs. Chamberlain showed a book to Miss Wakefield which purportedly contained a record of the receipts and expenses of the hotel. That book, according to Miss Wakefield's testimony, was in the form of a tablet. The book also contained "totals" which showed that plaintiffs "averaged" about $100 a day. About April 4, 1947, Miss Wakefield told plaintiffs she could not go into the hotel business alone, but if her brother could sell his ranch in Oregon he "might go in" with her. Mrs. Chamberlain said they would take the ranch in "as a trade." Thereafter, Mr. Chamberlain went to Oregon to see the ranch and while there told Mr. Wakefield that the hotel "took in" from $2,650 to $3,500 per month.

On April 16, 1947, the Landers served upon plaintiffs a written notice of cancellation of the lease, which notice stated that it was given for the reason plaintiffs had not paid the rent for the current month, and had failed to keep the furniture, the equipment, and the hotel building in good repair and in a clean and sanitary condition. Mr. Landers testified that,

in a conversation with plaintiff Mrs. Chamberlain a few days after the notice was served, she asked him if he would "please wait a few days" because she thought that she and her husband had a "deal" they could make; that she said that her husband was then in Oregon at a ranch which the prospective buyers wanted to trade "for the hotel." Mr. Landers also testified that he told Mrs. Chamberlain that he would do nothing further until Mr. Chamberlain returned and either accepted or rejected the ranch. Mr. Chamberlain returned to California, and plaintiffs' attorney prepared an agreement, dated April 21, 1947, whereby plaintiffs agreed to sell and the Wakefields agreed to buy, the lease and the furniture for $28,500, which agreement provided that said sum should be paid as follows: $5,000 cash, transfer of a $7,500 equity in the Oregon ranch, and execution of a note for $16,000. Miss Wakefield signed the agreement and the promissory note. Mr. Chamberlain then took those documents to Oregon where they were signed by Mr. Wakefield. Plaintiffs thereupon assigned their lease to the Wakefields. Mr. Landers consented to the assignment of the lease, and the plaintiffs paid him $1,000 and also paid the past due rent of $750. Miss Wakefield took possession of the premises on April 22, 1947, and Mr. Wakefield and his wife came to the hotel from Oregon about May 1, 1947.

On May 9, 1947, defendants Wakefield sent a written notice of rescission to plaintiffs in which notice they stated that they had been induced to enter into the transaction by fraudulent statements and representations on the part of plaintiffs, and they demanded the return of everything of value received by plaintiffs, and offered to return everything of value received by them in connection with the transaction. The plaintiffs refused to accept the offer of rescission. The Wakefields, subsequent to the service of the notice of rescission, made no payments on the note to plaintiffs and paid no rent to the Landers. On June 10, 1947, plaintiffs filed this action on the $16,000 note.

The plaintiffs operated the hotel 11½ months (from May 14, 1946, to April 22, 1947). The income tax return of the plaintiffs, covering the period from May 14 to December 31, 1946, showed that the gross income from the hotel during that time was approximately $2,000 per month. Three books of plaintiffs which pertained to the hotel income were received in evidence as defendants' exhibits E, F, and G. Mrs. Chamberlain testified that those three books were the only books which were kept by plaintiffs during the period they oper-

ated the hotel, and that they had no other records showing income from the hotel. While testifying, she referred to one of those books and stated that the total income from the hotel, during the part of 1947 when plaintiffs were in possession, was as follows: $2,443.50 in January; $2,166.25 in February; $2,139.50 in March; and $1,530 from April 1st to April 21st. Another book of plaintiffs, which was in the form of a tablet, was received in evidence as defendants' Exhibit J. The entries therein were in Mrs. Chamberlain's handwriting; and they covered the 11½ months the Chamberlains operated the hotel. Those entries showed total receipts of approximately $3,000 for each month from July, 1946, to and including March, 1947, and the sum of $1,890 for the first 21 days in April, 1947. Mrs. Chamberlain testified, in attempting to explain why the monthly income as shown by Exhibit J was greater than that shown by the three other books, that the amounts shown in Exhibit J were not entirely for room rentals but represented money taken in for every purpose, including sums received from a dry cleaning agency, key deposits, tips and telephone charges. She testified further that she did not remember whether she showed that book (Exhibit J) to Miss Wakefield—that she thought she "just laid them [the books] all out." She also testified as follows: "Q. [by defense counsel]. And didn't you in connection with that [Exhibit J] say, 'you see, I am averaging from 2750 to better than $3,000 a month gross in this hotel?' A. Counting the telephones, I said that was up to her, she could make more on the telephones." Mrs. Chamberlain also testified that the entries in Exhibit J were her "own personal memos," were "not meant for anyone else's eyes," and included income from another hotel in which she had an interest.

In support of plaintiffs' (appellants') contention, above stated, that the evidence does not support the finding of fraud, they argue in effect that there was no evidence that plaintiffs told the Wakefields or represented to them that the gross income averaged $2,750 per month, or that the net income averaged $1,500 per month, or that the net profit for the past year was $18,000. As above shown, there was evidence that the plaintiff Mrs. Chamberlain had stated on the broker's listing card that the gross income was about $2,750 per month and the net income was about $1,550 per month; and that the broker had informed Miss Wakefield that those amounts of income had been stated on that card. Also there was evidence that Mrs. Chamberlain told Miss Wakefield that the income

was from \$2,750 to \$3,500 per month, that she would net \$1,500 per month, and that the net income for the year was \$18,000. Mrs. Chamberlain exhibited to Miss Wakefield a book showing that the income averaged about \$100 a day. Mr. Chamberlain told Mr. Wakefield that the income was from \$2,650 to \$3,500 per month. The evidence was sufficient to support said finding that the plaintiffs told the Wakefields that the gross income averaged \$2,750 per month, that the net income averaged \$1,500 per month, and that the net profit for the past year was \$18,000. Also a further finding that the gross income, for the year preceding the sale "averaged slightly in excess of \$2,000 per month" was supported by the evidence. The 1946 income tax return of plaintiffs, which included the first seven and one-half months of the 11½ months that plaintiffs operated the hotel, showed that the gross income was about \$2,000 per month. Mrs. Chamberlain testified, by reference to one of the three books (Exhibits E, F, and G), that the gross income for the period of time plaintiffs operated the hotel in 1947 (approximately three and three-fourths months) was \$8,279.25 or an average of approximately \$2,200 per month. It appears therefore that plaintiffs told the Wakefields that the average gross monthly income was much greater than it actually was. The trial judge might well have concluded from the evidence that the book which Mrs. Chamberlain exhibited to Miss Wakefield during the negotiations preceding the sale was Exhibit J, which showed that the average monthly gross income for the 11½ months that plaintiffs operated the hotel was \$3,000. The explanation, above mentioned, which Mrs. Chamberlain gave regarding Exhibit J, to the effect that the larger monthly income shown therein included dry cleaning charges, key deposits, telephone charges, and income from another hotel, apparently was not accepted by the trial judge. Since Mrs. Chamberlain testified that the three other books (Exhibits E, F, and G) were the only records showing the income, and since the entries in Exhibit J were more in accord with the alleged representations of plaintiffs regarding the income, and since Mrs. Chamberlain testified that the entries in Exhibit J were "not meant for anyone else's eyes," the trial judge might have inferred that Exhibit J was a book of false entries which Mrs. Chamberlain used to support her oral statements regarding the income. During the negotiations with the Wakefields the plaintiffs had been given notice of cancellation of their lease, and they had asked the Landers to delay the cancellation a few days so that

plaintiffs might try to sell the lease. The evidence was sufficient to support the finding of fraud.

█ Appellants assert that the Wakefields did not rely on the alleged misrepresentations. They argue that since Miss Wakefield was a real estate broker she was familiar with buying, selling and leasing property; that she examined the premises and was in a position to know or ascertain the facts. The court found that the Wakefields did rely upon said misrepresentations. That finding was supported by the evidence. The evidence shows that the plaintiffs made positive statements regarding the income and expenses. Those matters were facts within the knowledge of plaintiffs. ''One who is induced to enter into a contract by positive representations of fact is under no duty to inquire as to the truth of the representations unless he is made aware of facts which bring them under suspicion and which would induce a prudent man to make inquiry.'' (*Mirich* v. *Underwriters at Lloyd's London,* 64 Cal.App.2d 522, 531 [149 P.2d 19].) A person ''can act upon the presumption that there exists no intention to defraud him.'' (*Anderson* v. *Thacher,* 76 Cal.App.2d 50, pp. 70-71 [172 P.2d 533].) The circumstances here were not such that the Wakefields were required to inquire as to the truth of plaintiffs' representations.

█ Appellants contend that the evidence does not support a finding by the trial court that the lease and plaintiffs' interest in the furniture were of no value. That part of the finding relating to the value of the lease was apparently based upon a further finding of the court that: for the year immediately preceding execution of the agreement, the gross income of the hotel ''averaged slightly in excess of $2,000 per month,'' and after deduction of the expenses and ''a reasonable allowance for wages'' for the operation of the hotel there was no net income. Appellants argue that the sum which the court regarded as wages should have been treated as net income. Irrespective of whether such sum be treated as wages or as net income, it was not a gain which accrued on the capital investment. Appellants' records showed no allowance for compensation for the greater portion of the work performed in operating the hotel during the term of their lease. There was evidence that, except for the services of one employee who was paid $75 a month, most of the work was performed by plaintiffs and their son and his wife; and that neither plaintiffs nor the son and his wife received any salary during the entire period. There was also evidence that the total

amount paid by plaintiffs in salaries during the period they operated the hotel, which was approximately 11½ months, was $987. Furthermore, the evidence shows that during this period plaintiffs expended little or nothing in upkeep and repair. The court therefore was justified in deducting reasonable compensation for necessary services rendered in the operation of the hotel in order to determine whether the lease had a value at the time it was transferred to the Wakefields. Appellants also seem to argue that the above finding, relating to gross and net income, was based upon the income and expenses of the hotel during the period it was operated by the Wakefields. It does not appear, however, that said finding was based upon such income and expenses. There was evidence, including testimony by Mrs. Chamberlain, that the gross income of the hotel during the period plaintiffs operated it averaged approximately $2,000 a month. In making its findings, the court had before it the records (Exhibits E, F, and G), produced by plaintiffs, which Mrs. Chamberlain testified showed the entire income and expenses of the hotel during the period it was operated by plaintiffs. The evidence was sufficient to support the finding that the lease was of no value.

As to that part of the finding relating to the furniture, there was evidence that plaintiffs had misrepresented the condition of the furniture and furnishings to the Wakefields. There was evidence that the draperies were "all torn and the mattresses were practically all ruined"; that there were no window shades; that the rugs were in a "terrible" condition; that the linens were torn and mended; that when Mr. Landers took possession of the hotel on October 24, 1947, under the unlawful detainer judgment (which was six months after the Chamberlains left the hotel), "everything in the hotel was not worth more than $500"; and that he spent about $10,000 to replace some of the furniture and to redecorate part of the hotel. The trial judge said that the furniture was so inextricably mingled in the lease transaction that it had no value commercially. A hotel owner, who was called as a witness on behalf of plaintiffs, testified that the furniture without the lease "would not be worth anything practically," and that all of the furniture in all of the rooms put together "would not be worth over $4,000 or $5,000 out on the street." As above shown, the furniture was subject to a mortgage in favor of the Landers to secure the performance of the covenants of the lease; and it was also subject to a second mortgage

to secure the payment of a note for $5,800 made by the Chamberlains and payable to one Seagle. The evidence was sufficient to support the finding that the plaintiffs' interest in the furniture was of no value.

■ Appellants also contend that rescission was not a proper remedy under the circumstances of this case for the reason that the Wakefields did not make restoration of that which they received from plaintiffs. When the notice of rescission was given on May 9, 1947, the plaintiffs refused, as above stated, to accept the offer of rescission. On July 9, 1947, the Landers commenced an action against the Wakefields and the plaintiffs herein to foreclose the mortgage on the furniture. That action was still pending at the time the trial of the present action was commenced on January 22, 1948. On September 10, 1947, the Landers served a notice on the Wakefields and the plaintiffs wherein it was stated that those persons were required to pay the past due rent, or surrender possession of the premises within three days. No rental was paid subsequent to the service of said notice, and on September 15, 1947, the Landers commenced an action in unlawful detainer against the Wakefields. On October 21, 1947, the Landers obtained therein judgment for possession of the premises and for $3,750 past due rent. The Landers took possession of said premises about October 24, 1947. The Wakefields had occupied the premises from April 22, 1947, until that date. Appellants argue that the Wakefields could not restore possession to them for the reason that the Landers would not permit appellants to reoccupy the hotel. Even though the Wakefields could not restore possession to the appellants, they were not thereby deprived of the remedy of rescission. As above shown, there was nothing of value to restore. Under circumstances where nothing of value has been received, restoration is not a legal requirement. (*Esau* v. *Briggs,* 89 Cal.App.2d 427, 436 [201 P.2d 25]. See *Simmons* v. *California Institute of Technology,* 34 Cal.2d 264, 275 [209 P.2d 581].)

■ Appellants contend that the trial court erred in refusing plaintiffs' motion to consolidate the action to foreclose the mortgage on the furniture with the present action. Prior to the trial of this action counsel for plaintiffs made a motion to consolidate the actions, and the court denied the motion. The Wakefields were named as defendants in the foreclosure action but they had not been served therein at the time the motion was made. A motion to consolidate actions for trial

is addressed to the discretion of the court, and its discretion will not be interfered with on appeal except where there has been an abuse of discretion. (*McArthur* v. *Shaffer*, 59 Cal.App. 2d 724, 727 [139 P.2d 959].) There was no abuse of discretion in denying said motion.

Appellants contend further that defendants Landers unjustifiably interfered with the performance of the contract by the Wakefields, and that there was a conspiracy between the Landers and the Wakefields to effect a forfeiture of the lease. Appellants argue that some of the circumstances which indicate such a conspiracy are: that the Landers refused to allow plaintiffs to retake possession; that defendant Landers resisted plaintiffs' motion to consolidate the actions; and that on one occasion the attorney for the Wakefields cross-examined a witness on a point which the court had previously ruled was hearsay. There was evidence that the Landers would not permit the plaintiffs to reoccupy the hotel because the Health Department had been "after" the Landers, while the plaintiffs were in possession, "as the place was dirty, filthy and they had a bunch of sporting women in there." The Landers were not parties to, and had no knowledge of, the misrepresentations which plaintiffs made when they sold the lease. The Landers were under no legal duty to accept the plaintiffs as tenants. This contention is not sustained.

Appellants further contend that an accounting was not proper in the present case and that the admission of evidence for an accounting was error. This contention is not sustainable. In *Swan* v. *Talbot*, 152 Cal. 142 [94 P. 238, 17 L.R.A. N.S. 1066], the trial court adjudged that plaintiff was entitled to rescission of a bill of sale but it found that it was impracticable to decree restoration of the property, and it thereupon stated and settled an account between the parties. The Supreme Court, in affirming the judgment, said at page 147, that the "proceeding adopted by the court was wholly consonant with the principle that where equity has acquired jurisdiction for one purpose it will retain that jurisdiction to the final adjustment of all differences between the parties arising from the cause of action presented." Under this principle, the court may "properly order an accounting although the complaint did not ask for such relief." (*Sears* v. *Rule*, 27 Cal.2d 131, 149 [163 P.2d 443].)

Appellants further contend that the court had no jurisdiction to direct, upon failure of plaintiffs to execute a conveyance of the land in Oregon within 10 days, that the

clerk of the court execute such conveyance. A superior court of California which has jurisdiction of the person has the power to compel a conveyance of land outside the state. (*Tully* v. *Bailey,* 46 Cal.App.2d 195, 198 [115 P.2d 542] ; *Tomaier* v. *Tomaier,* 23 Cal.2d 754, 760 [146 P.2d 905].) ''Such a decree does not operate directly upon the property nor affect the title. The decree is made effectual through the coercion of the parties by directing some action on their part or by enjoining them from doing a certain thing.'' (*Tully* v. *Bailey, supra,* p. 198.) If the court has power to order a party to convey land outside the state, it follows that upon his failure to do so the court has power to enforce its order by directing the clerk to execute the conveyance.

 Appellants contend further that it was error for the trial court to sign findings prior to the expiration of five days after service thereof. Section 634 of the Code of Civil Procedure provides, in part, that ''the court shall not sign any findings therein prior to the expiration of five days after such service.'' That section is directory and not mandatory. (*Bradford* v. *Southern Cal. Petroleum Corp.,* 62 Cal.App.2d 450, 463 [145 P.2d 36] ; *Treat* v. *Superior Court,* 7 Cal.2d 636, 639 [62 P.2d 147].) In the absence of a showing of prejudice, failure to comply with that section will be disregarded on appeal. (*Estate of Rosland,* 76 Cal.App.2d 709, 712 [173 P.2d 830].)

 Appellants assert that there were certain inconsistencies in the findings. The court made certain findings by stating whether the allegations in certain designated paragraphs of the pleadings were true or not true. In making the findings under such method, it appears that, by reason of negative expressions in such references, the court found in effect that the hotel had not been leased to Mrs. Story. It was undisputed that the hotel had been leased to Mrs. Story. In making another finding by such reference method, the court in effect found that payments had been made upon the $16,000 note. It was stipulated that nothing had been paid on the note. It appears therefore that if those findings had been made in accordance with the evidence they would not have been more favorable to appellants than the findings which were made. Other alleged inconsistencies in the findings do not merit discussion.

The judgment is affirmed. The appeal from the order denying the motion for a new trial is dismissed.

Shinn, P. J., and Vallée, J., concurred.