Filed 11/6/13  Elworthy v. Spiva CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| BRUCE R. ELWORTHY, et al., | H037747 |
| | (Monterey County |
| Plaintiffs and Appellants, | Super. Ct. No. M87603) |
| v. | |
| STEPHAN SPIVA, et al., | |
| Defendants and Respondents. | |

This litigation arises out of a real estate transaction in which Bruce Elworthy and Anne Marshall (husband and wife, jointly Buyers) purchased a home for $3 million from Stephan (Steve) and Barbara Spiva (Spivas or Sellers).  After they discovered several defects with the home, many of which had to do with windows and doors that leaked, Buyers sued Sellers, Sellers' real estate agents, and certain parties responsible for the construction of the home.  After settling with some defendants and dismissing others, the case was tried to the court on Buyers' claims for intentional misrepresentation, negligent misrepresentation, and rescission against Sellers.  The court found for Buyers on their claim for negligent misrepresentation about the doors that leaked; it awarded Buyers $60,000 in damages.

In this appeal, Buyers challenge the trial court's ruling that rescission of the house purchase—as opposed to a $60,000 damages award—was not available to them as a

remedy.  Buyers contend the court erred when it refused to grant their request for rescission, abused its discretion when it found that Buyers were guilty of laches, and erred when it failed to consider that Sellers engaged in "more than mere 'negligent misrepresentation.' "  We conclude that the court properly found that rescission was not available to Buyers because they had lost the property to foreclosure.  Accordingly, we will affirm the judgment.

## FACTS & PROCEDURAL HISTORY

Respondents Steve and Barbara Spiva were planning to retire and decided to build a home at the Pasadera Golf Club on Highway 68 in Monterey.  In March 2000, they purchased a lot (approximately eight tenths of an acre) at 612 Belavida Road, adjacent to the fifth green, for $665,000.  They also hired Jerry Whitney, a draftsman who had designed other homes in the area, to draw up the plans for their new home.  The Spivas liked their house in Hollister, and asked Whitney to use the same basic layout for their new home, but to design it on a grander scale.  They told Whitney they wanted to look "right down the chute of the fairway."

In March 2001, the Spivas hired General Contractor Richard Avila to build the house.  The contract price was $1,974,270.  A building permit was issued in May 2001. Construction proceeded without significant problems; the project was completed on time and on budget.

The 5,460-square-foot, two-story house had four bedrooms, seven bathrooms, an exercise room, and an office.  The house had "eight windowed French doors" and made "extensive use of windows," which provided "an openness with natural light."  Whitney specified the use of ADA-compliant, low-threshold patio doors on the south side of the house, which overlooked the golf course.  The windows and the exterior doors were manufactured by Weather Shield Manufacturing, Inc. (Weather Shield).  The Spivas did

2

not have any input into the decision to use low-threshold doors or the choice of window and door manufacturer.

While the house was under construction, the seals failed in some of the double-paned windows in the master bedroom, which made the windows fog. Weather Shield repaired seal failures three times between March 19 and June 14, 2002. The repairs involved replacing the window panes where seal failures had occurred.

During construction, Avila observed evidence of water intrusion through the threshold of the patio doors in the master bathroom and the upstairs office. After a rainstorm, Avila saw half a cup of water on the tile floor in the bathroom and noted dampness on the subflooring in the office (the carpeting had not yet been installed). He reported the problem to Weather Shield. Weather Shield gave him a new threshold, which his crew installed on the patio door in the office. Weather Shield also made adjustments to the other doors.

Avila testified that toward the end of the construction, right before the final inspection, he told the Spivas that (1) there had been a problem with water intrusion in the master bathroom and the office; (2) he had had the doors adjusted; (3) he had installed a new threshold on the office door; and (4) everything should be alright.[1] Avila also testified that he told the Spivas about the window failures that occurred during construction. But Steve Spiva testified that Avila never informed the Spivas that there were any problems with the doors or windows during construction.

The Spivas moved into the home in June 2002. After they moved in, Weather Shield repaired windows on three occasions: (1) in October 2002, it replaced a scratched window; (2) in November 2002, it repaired seal failures in two panes of one window; and

---

[1] At trial, Avila testified that he was worried about the low thresholds on the patio doors; he said he feared they would leak, and wished he had sent the thresholds back to Weather Shield. Avila expressed his concerns to Whitney, the draftsman, who told him that the low-threshold doors were used all the time "back east." Avila did not discuss his concerns with the Spivas.

(3) in December 2002, it replaced a window pane that had a stress crack. Steve Spiva testified that he did not think the number of window failures was unusual; he experienced more problems with double-paned windows in other homes he had owned.

After the Spivas moved in, they experienced one incident of water intrusion under the patio doors. In November 2002, during a rainstorm with "very heavy sideways rain," the patio doors in the master bedroom, master bathroom, kitchen, and office, which were all on the south side of the house, leaked. Steve Spiva was away on a trip, but Barbara Spiva was home and noticed water coming in under the doors. She put rolled up towels at the thresholds and called Avila. Avila and a representative of Weather Shield inspected the doors. Avila adjusted the doors and the Spivas did not experience any other incidents of water intrusion under the patio doors during the two winters they lived in the house. They attributed the single incident of water intrusion to "post-construction fine tuning."

Steve Spiva played golf once or twice a day and was very happy at Pasadera. But Barbara Spiva felt isolated there. Barbara had family in San Diego and in the summer of 2003, the Spivas started splitting their time between San Diego and Monterey. In June 2003, they decided to sell the Monterey house and move to San Diego. They hired Realtor Jeff Davi and initially offered the property for sale at $4.8 or $4.9 million. In July 2003, they leased an apartment in San Diego. After that, they spent more time in Monterey than in San Diego. They did not experience any water intrusion during the winter of 2003-2004.

After Christmas 2003, the Spivas started spending more time in San Diego than in Monterey. On March 31, 2004, they lowered the price on their Monterey home to $4,595,000. In June 2004, they bought a house in Solana Beach in San Diego County, and in July 2004, they moved their furniture from Monterey to Solana Beach. In November 2004, the Spivas lowered the price on their Monterey home to $3.5 million. While the Monterey house was on the market, the Spivas asked their realtor to check the

4

house for water intrusion whenever it rained.  The realtor's assistant checked and never saw any problems, so the Spivas assumed there were no further problems with leaky doors.

The house did not sell.  In June 2005, after their listing agreement with Davi expired, the Spivas retained a new realtor, Joy Jacobs of Keller Williams Realty.  Jacobs's MLS listing described the Spivas' house as "Custom built estate on the fifth green.  Awe-inspiring and in pristine condition.  . . .  True luxury including granite and stone throughout, expansive patios [with] 360 degree views, smart system, office with terrace, exercise room."

In June 2005, the Spivas completed real estate property disclosure forms.  In response to the question "Are you (Seller) aware of any significant defects/malfunctions in any of the following?  . . . Windows . . . Doors . . . ," they responded "No."  In answer to the questions "ARE YOU (SELLER) AWARE OF . . . 1. Any . . . replacements or material repairs on the Property,  [¶] [¶]  4. Defects in the following, (including past defects that have been repaired) . . . doors, windows . . .  [¶] [¶]  6. Water intrusion into any part of any physical structure on the Property; leaks from or in any appliance, pipe, slab or roof; standing water, drainage, . . . , moisture, . . . on or affecting the Property," they responded "No."  The Spivas testified that they did not disclose the water intrusion in November 2002 because they did not think it was a serious problem and they believed the doors had been fixed.

In Response to the questions "ARE YOU (SELLER) AWARE OF . . . 2. Ongoing or recurring maintenance on the Property (for example, drain or sewer cleanout, tree or pest control service) [¶]  [¶]  9. Pets on or in the Property . . . .  [¶]  10. Problems with . . . wildlife, insects or pests . . . .  [¶] [¶]  12. Past or present treatment or eradication of pests . . . ," the Spivas answered "No."  In fact, the Spivas owned a small dog when they lived in the house.  Steve Spiva explained that by the time they completed the disclosure forms in 2005, they had forgotten about the dog because it had passed way more than two years

5

earlier. The Spivas had seen a couple of mice in the "cart barn" where they stored the golf carts. They had also seen ants on the property. As they had done with previous homes, the Spivas hired Terminix, a pest control service, to perform monthly maintenance during the entire time they owned the Monterey house. At trial, the Spivas testified that they did not disclose any pests on the property because Terminix kept the pests under control.

In October 2005, the Spivas sold their Monterey home to Buyers Elworthy and Marshall for $3 million.[2] The sale included the home entertainment system and the Crestron smart home touch screen control system that Sellers had purchased for $95,053.56. Buyers also purchased a membership at the Pasadera Country Club.

Buyers were attorneys who handled tax, probate, trust and estate planning, and fiduciary malpractice cases. Elworthy was also a litigator who had experience handling construction defect litigation. Although they had previously resided in California, Buyers moved to Sheridan, Wyoming in 1997 to be closer to clients in Texas, Minnesota, and Colorado. In 2005, they decided to move back to California and looked at homes in San Francisco and Monterey County. They were looking for a luxury, "turnkey" property that did not require any work. In May 2005, five months before buying the Monterey house, Buyers placed their house in Wyoming on the market. Although Buyers expected their Wyoming property to sell within one year, by the time of trial in April 2011, the property still had not sold. Elworthy testified it was a "very unusual and large property" for Wyoming.

When they walked through the Monterey house in October 2005, Buyers noticed water damage to the paint and sheetrock around several doors. According to Buyers, they asked real estate agent Joy Jacobs about it and she attributed it to a "sloppy maid."

---

[2] The purchase price listed on the purchase agreement was $2,820,000. The parties entered into a separate agreement whereby Buyers agreed to pay broker commissions of $180,000, making the total value of the sale $3 million.

(Jacobs could not recall making that statement.) On October 21, 2005, the day they made their offer, Buyers observed a Weather Shield repairman making window repairs. Elworthy spoke to the repairman "for a couple minutes." Buyers testified that Jacobs told them the window had been hit by a golf ball. (Jacobs did not recall making that statement either.) According to the repairman, he replaced two small panes of glass in the master bedroom and a window sash in the master bathroom, all of which had seal failures.

During the escrow period, Buyers had the property inspected by Robert Ferguson of Pacific Coast Inspections. Buyers and their agent were present during the inspection. Ferguson told Buyers several times he thought the house was well built; he noted some minor deficiencies, including minor cracks in the driveway, and recommended minor repairs. He did not notice any problems with the windows or doors or any damage to the sheetrock near the doors. Buyers obtained a termite report from Terminix; Buyers knew Terminix had been servicing the property and reasoned that it would be familiar with the property. Buyers had the radiant heating system inspected by Garza Plumbing (Garza), the subcontractor that installed the heating system in the house. The Garza technician reported that the heating system was working properly. Buyers wanted to have the entertainment system inspected by Monterey Stereo, the company that had installed it. But Monterey Stereo was not available during the escrow period. Buyers were satisfied with the inspection reports and escrow closed on November 23, 2005.

To fund their purchase, Buyers refinanced their Wyoming house and pulled out $1.15 million in equity, which they used to pay for the Monterey house. Buyers also obtained a first mortgage for $1.5 million and a HELOC (home equity line of credit) for $282,000 on the Monterey house. The first mortgage on the Monterey house required payments of interest-only for the first five years, with payments of $8,750 per month. The total debt service on both houses was more than $16,000 per month.

Buyers moved into the Monterey house in December 2005. Within the first few days, they testified that they discovered ants in the master bathroom and kitchen, and

7

nests of ants under the Jacuzzi bathtub and the foundation. They hired a pest control service to spray for ants. The following week, they discovered dead and dying mice in the kitchen, laundry room, attic, and some walls. Elworthy removed several dead mice himself and then hired a pest control service to handle the problem. Afterwards, Buyers were able to keep the mice under control with regular service. At trial, Buyers testified about a number of other defects, including windows and doors that leaked.[3]

Initially, Buyers complained about the defects to Sellers, Avila, Monterey Stereo, Garza, and Sellers' realtors, and the parties attempted to resolve the problems informally. The Sellers paid for repairs to the alarm system and for pest control, and offered to pay to have the Crestron smart home control system reprogrammed. Monterey Stereo paid for repairs to one of the TV's and Avila made several proposals for fixing the patio doors.

In May 2006, Buyers retained Whitney, the same draftsman used by Sellers, to design a second garage for the property; they planned to build a two-story, detached, 3-car garage, with a "shop/craft room" on the second floor. Buyers believed the project would help remedy some of the problems they were having with the phone, Internet, heating, and electrical systems in the house by bringing additional wiring to the east side of the property. Buyers also planned to remove the patio door from the master bathroom.

---

[3] Buyers complained that: (1) twelve windows had failed, including fogging (moisture between the panes) and flaking of the ultraviolet coating; (2) water intruded under the patio doors whenever there was a serious rain storm; (3) the hot water mixer in the master bathroom shower was broken; (4) the Crestron control system had been unplugged and needed to be reprogrammed; (5) components of the entertainment system did not work; (6) although the house had been advertised as having Internet access in every room, there was no Internet access where Buyers set up their office; (7) the wiring of telephone jacks and the 240-volt outlet in the laundry room was faulty; (8) the bedroom Marshall used as an office was too cold; (9) the driveway was cracking significantly and the retaining walls along the driveway were defective and encroached on the property next door; (10) parts of the yard did not drain properly; (11) the security camera at the front door did not work; (12) the alarm system and electrical lighting were defective; (13) the slate on the exterior patios and decks was disintegrating; (14) exterior water spigots were ineffective; and (15) the shades in the kitchen were decorative only and did not cover the windows.

Whitney worked on the plans until at least December 2006. Buyers testified that as of early 2007, their law practice was going very well; at that time, they planned to keep the Monterey house, both as their residence and their office, and to repair it.

But on August 1, 2007, Elworthy sent a letter to Sellers' counsel suggesting Sellers "budget funds well in the six figures in the event they want to settle and that their broker should consider budgeting even more." He also suggested Sellers "consider the immediate repurchase of the home and [golf] membership" to "avoid the litigation and certain result that will follow." Elworthy testified that this letter was a formal demand for rescission.

In 2007, Buyers hired Structural Engineer Brett Ferrari to inspect the Monterey house. Ferrari did a "brief inspection" on October 19, 2007, which did not include any destructive testing. Ferrari opined that the "patio doors need to be removed and replaced with new thresholds and pan flashing installed and properly integrated with the building envelope." He stated that the "unacceptable rate of window failure and the inefficiency of performing piecemeal repairs suggests that the windows should be replaced entirely with [windows from] a different manufacturer." Ferrari recommended repairing the retaining walls and cracks on the interior walls, replacing the driveway, and installing a "trunk line of CAT-5 cables" to address problems with the thermostats, controllers, Internet, and telephones; he said further investigation was required to address other issues. Later, Buyers retained Larry Daniels, a general contractor and construction estimator, who opined that it would cost $1,060,434 to fix the defects identified in Ferrari's report. Daniels's estimate assumed that all exterior doors needed to be replaced, even those that did not leak.

On November 14, 2007, Buyers filed their complaint for "damages for negligence, breach of contract, negligent misrepresentation, intentional misrepresentation/fraud and rescission." Named defendants included Keller Williams, Jacobs and other employees of Keller Williams (jointly real estate defendants), Sellers, Whitney, Avila, Garza, and

Weather Shield. The complaint alleged causes of action for negligent misrepresentation, intentional misrepresentation, and rescission against Sellers. The defendants filed cross-complaints against one another and other subcontractors involved in the construction of the home.

Buyers also stopped paying the first mortgage on the Monterey home in November 2007. Later, they entered into a forbearance agreement with their lender pursuant to which the lender agreed that Buyers could stop making payments on the first mortgage and the HELOC. In exchange for the lender's forbearance, Buyers agreed to pay the insurance premiums and property taxes, maintain the property, list it for sale, prosecute the instant lawsuit, and bring the loan current from the proceeds of any sale or the lawsuit. Buyers relied on an oral agreement with the lender's attorney in Texas and did not obtain the agreement in writing. Subsequently, there was a change in loan servicer, and the property went into foreclosure. In June 2009, the lender issued a Notice of Default and Election to Sell. At that time, Buyers owed $174,742.50 in past due payments, costs and expenses.

In December 2007, Elworthy was diagnosed with a brain tumor. He had surgery to remove the tumor in the summer of 2008; after the surgery his ability to work as an attorney was impaired.[4] In October 2008, Buyers decided they could no longer afford both houses and moved back to Wyoming permanently. In November 2008, Buyers listed the Monterey home for sale for $3.2 million. Thereafter, Buyers stayed in the house whenever they were in California.

In the fall of 2009, Buyers dismissed their construction defect claims against Avila, Whitney, and Weather Shield; Buyers did not settle with those defendants and

---

[4] Buyers testified that Elworthy was unable to work as an attorney after the surgery and did not represent third parties. He did, however, act as cocounsel in this case; he handled the discovery, including numerous depositions. He also represented Buyers in litigation with the Pasadera Country Club.

10

took the position that it was up to Sellers to pursue the construction defects claims. In September 2009, Buyers settled with the real estate defendants and Garza Plumbing. The court granted the settling parties' motions for good faith settlement and Buyers received the settlement proceeds in October and December 2009.

The trustee's sale was initially set for January 12, 2010, and was then continued to a date in April 2010. Although Buyers had more than enough money from the settlements to pay the past due amounts and to stop the foreclosure, they allowed the foreclosure sale to occur.[5] Elworthy testified that given their overall finances and his failing health, Buyers decided it was in their best interest to retain the settlement funds rather than use them to bring the loan current and avoid foreclosure. The lender bought the property at the trustee's sale and sold it to a third party in June 2010 for $1.67 million.

The cross-complaints were bifurcated for trial. Between March and May 2011, the court held a 14-day bench trial on Buyers' claims against Sellers. In their trial brief, Buyers stated, "This matter is proceeding as an action for fraud in the inducement. [Buyers] will make their election between a claim for damages or rescission in a timely manner prior to entry of judgment." On the ninth day of trial, Buyers' counsel advised the court that Buyers had not yet elected between rescission and a damages remedy.

Buyers' expert witnesses included Stephen Brown, an appraiser. Brown testified that the unimpaired value of the Monterey house in 2005 was $3 million and that the diminution in the value of the home, assuming it had all the defects alleged by Buyers, was $800,000.

Sellers' construction expert, General Contractor Robert Fransen, testified that the cost to replace the six patio doors that leaked was $30,000. He testified that the

---

[5] Elworthy testified that he contacted the loan servicer and was told that he had to pay the mortgage in full to avoid foreclosure. He did not determine whether Buyers had the right to reinstate the loan and avoid foreclosure by bringing past due amounts current. The Notice of Default indicates that Buyers could have reinstated the loan by paying past due amounts.

11

maximum cost of repairing all of the items Buyers claimed were defective was $75,000, and that he told counsel that he was willing to do the repairs at that price when he inspected the property in May 2008. The defense appraiser, Todd Johnson, agreed that the unimpaired value of the Monterey house in November 2005 was $3 million and testified that the market value of the home at that time, assuming the defects were limited to those described by Fransen, was between $2.92 and $2.95 million.

Buyers requested rescission damages totaling $4,912,000 based on all of the costs they incurred to own the home, including: (1) $1,059,756 for their down payment; (2) $1,782,000 they borrowed on the Monterey house; (3) $1,499,533 interest on their loans at the rate of 10 percent; (4) $353,000 in taxes, fees, improvements, and repairs; and (5) $118,000 for their golf membership. They argued that Sellers were entitled to a credit of $1,670,000 from the sale of the house, for a net claim of $3,252,000.

The court issued a 46-page statement of decision. The court concluded that rescission was not available as a remedy because (1) it was barred by laches, and (2) Buyers could not restore the consideration they had received under the contract because the home had been lost to foreclosure. The court found that there were no intentional misrepresentations, but that Sellers had negligently misrepresented the condition of the patio doors in their real property disclosures by failing to disclose the water intrusion incident in November 2002. The court also found that Sellers' disclosures were inaccurate because they failed to disclose that they had owned a dog and had a monthly pest control service. The court concluded, however, that there was "no reliance on or damage flowing from" the misrepresentations regarding pets and pests. The court found that the number of window failures was not excessive for new construction of this size and was not something Sellers had to disclose. As for the other defects alleged, the court found that Buyers failed to prove that (1) the condition was defective, (2) the claimed defect was material, (3) the defect existed when Sellers made their disclosures, (4) there were any misrepresentations regarding the issue, or (5) a combination of these factors.

12

The court found that some defects were visible upon inspection and that Buyers did not avail themselves of the opportunity to inspect. The court was persuaded by Fransen's methodology for repair or replacement of the doors, but concluded that his cost of repair was too conservative. Accordingly, the court doubled the amount estimated by Fransen for replacing six patio doors and awarded Buyers $60,000 in damages. The court found that the entire $60,000 awarded to Buyers against Sellers was offset by the amount of the good faith settlements with Garza and the real estate defendants. The court entered judgment in favor of Sellers and found that Sellers were prevailing parties for the purpose of awarding costs. The court subsequently denied Buyers' motions for new trial and to vacate the judgment. Buyers filed a timely notice of appeal.

**DISCUSSION**

Buyers contend the court erred when it refused to grant their request for rescission, abused its discretion when it found Buyers were guilty of laches, and erred when it failed to consider that Sellers engaged in "more than mere 'negligent misrepresentation.' "

## I. Rescission

### A. General Principles

When a party to a contract has been injured by a breach of contract or fraud and lacks the ability or the desire to keep the contract alive, the injured party may choose between two different remedies. (*Akin v. Certain Underwriters at Lloyd's London* (2006) 140 Cal.App.4th 291, 296 (*Akin*) [breach of contract]; *Campbell v. Birch* (1942) 19 Cal.2d 778, 791 [fraud]; *Lenard v. Edmonds* (1957) 151 Cal.App.2d 764, 768 [fraud].) The injured party may: (1) disaffirm the contract, treat it as rescinded, and recover damages resulting from the rescission; or (2) affirm the contract and recover damages for breach of contract or fraud. (*Akin*, at p. 296; *Campbell*, at p. 791, *Bancroft v. Woodward*

13

(1920) 183 Cal. 99, 101 (*Bancroft*).)  An action for rescission is based on the disaffirmance of the contract and an action for damages is based on its affirmance.  (*Akin*, at p. 296*,* citing *Davis v. Rite-Lite Sales Co.* (1937) 8 Cal.2d 675, 678-679; *Bancroft*, at p. 101.)

Rescission and damages are alternative remedies.  (*Akin*, *supra*, 140 Cal.App.4th at p. 296.)  A party may seek rescission or damages for breach of contract or fraud "in the event rescission cannot be obtained" in the same action.  (*Williams v. Marshall* (1951) 37 Cal.2d 445, 457 [defrauded vendee], citing *Bancroft*, *supra*, 183 Cal. 99; *Walters v. Marler* (1978) 83 Cal.App.3d 1, 16 (*Walters*) [breach of contract], overruled on another ground in *Gray v. Don Miller & Associates, Inc*. (1984) 35 Cal.3d 498, 505-507.)  "But the election of one remedy bars recovery under the other."  (*Akin,* at p. 296, citing *Alder v. Drudis* (1947) 30 Cal.2d 372, 383.)

## B.  Statutory Grounds for Rescission

The grounds for rescinding a contract are set forth in Civil Code section 1689.[6] That statute provides in relevant part that a "party to a contract may rescind the contract" if "the consent of the party rescinding, . . . , was given by mistake, or obtained through . . . , fraud, or undue influence, exercised by . . . the party as to whom he rescinds . . . ." (§ 1689, subd. (b)(1).)

Section 1691 sets forth the procedural requirements for rescission.  It provides: "Subject to section 1693, to effect a rescission a party to the contract must, promptly upon discovering the facts which entitle him to rescind . . . :  [¶]  (a) Give notice of rescission to the party as to whom he rescinds; and  [¶]  (b) Restore to the other party everything of value which he has received from him under the contract or offer to restore the same upon condition that the other party do likewise, unless the latter is unable or

---

[6]  All further statutory references are to the Civil Code, unless otherwise stated.

14

positively refuses to do so.  [¶]  When notice of rescission has not otherwise been given or an offer to restore the benefits received under the contract has not otherwise been made, the service of a pleading in an action or proceeding that seeks relief based on rescission shall be deemed to be such notice or offer or both."  (§ 1691.)

Section 1693 sets forth the effect of delay in notice of rescission or in restoration of benefits.  It provides:  "When relief based upon rescission is claimed in an action or proceeding, such relief shall not be denied because of delay in giving notice of rescission unless such delay has been substantially prejudicial to the other party.  [¶] A party who has received benefits by reason of a contract that is subject to rescission and who in an action or proceeding seeks relief based upon rescission shall not be denied relief because of a delay in restoring or in tendering restoration of such benefits before judgment unless such delay has been substantially prejudicial to the other party; but the court may make a tender of restoration a condition of its judgment."  Section 1693 contains an "express grant of authority to courts to exercise their discretion in delaying restoration until judgment."  (*Village Northridge Homeowners Assn. v. State Farm Fire & Casualty Co.* (2010) 50 Cal.4th 913, 929, fn. 6 (*Village Northridge*).)  In 1961, when the Legislature enacted section 1693, it sought "to promote a flexible approach to the restoration requirement" and "to address any unfairness that the rescinding parties might face if they were insolvent or without funds to restore consideration prior to filing suit."  (*Village Northridge*, at p. 928.)

Although "damages" are recoverable in an action for rescission, the nature of the damages available in such cases differs from the damages that may be recovered for breach of contract or fraud.  Section 1692, which sets forth the relief available in an action for rescission, provides in relevant part:  "A claim for damages is not inconsistent with a claim for relief based upon rescission.  The aggrieved party shall be awarded complete relief, including restitution of benefits, if any, conferred by him as a result of the transaction and any consequential damages to which he is entitled; but such relief

15

shall not include duplicate or inconsistent items of recovery. [¶] If . . . a party seeks relief based upon rescission, the court may require the party to whom such relief is granted to make any compensation to the other which justice may require and may otherwise in its judgment adjust the equities between the parties."

Section 1692 "essentially 'restates the equity jurisprudence applicable in the rescission context.' [Citation.] The fundamental principle underlying that jurisprudence 'is that "in such actions the court should do complete equity between the parties" and to that end "may grant any monetary relief necessary" to do so. [Citation.]' (*Runyan v. Pacific Air Industries, Inc*. (1970) 2 Cal.3d 304, 316 . . . (*Runyan*).) Rescission is intended to restore the parties as nearly as possible to their former positions and ' "to bring about substantial justice by adjusting the equities between the parties" despite the fact that "the status quo cannot be exactly reproduced." ' [Citations.] To achieve this objective, section 1692 provides that '[a] claim for damages is not inconsistent with a claim for relief based upon rescission.' It further provides that the aggrieved party shall be awarded 'complete relief,' including restitution and 'consequential damages.' " (*Sharabianlou v. Karp* (2010) 181 Cal.App.4th 1133, 1144-1145 (*Sharabianlou*).)

"The distinction between disaffirmance and affirmance of the contract has important consequences when it comes to damages. . . . Rescission extinguishes the contract (. . . § 1688), terminates further liability, and restores the parties to their former positions by requiring them to return whatever consideration they have received. [Citation.] Thus, the '[r]elief given in rescission cases—restitution and in some cases consequential damages—puts the rescinding party in the status quo ante, returning him to his economic position before he entered the contract.' " (*Sharabianlou*, *supra*, 181 Cal.App.4th at pp. 1144-1145.)

"In cases involving the rescission of agreements to purchase real property, California courts have held that the seller must refund all payments received in connection with the sale. [Citation.] *If the buyer has taken possession of the property,*

16

*the buyer must restore possession to the seller.* [Citation.] Such recovery of the consideration exchanged is part of restitution. [Citations.] As consequential damages, rescinding buyers or sellers may recover such items as real estate commissions paid in connection with the sale [citation], escrow expenses [citation], interest on specific sums of money paid to the other party [citation], and attorney fees in appropriate cases [citation]." (*Sharabianlou*, *supra*, 181 Cal.App.4th at pp. 1145-1146, citing *Kent v. Clark* (1942) 20 Cal.2d 779, 784, italics added.)

## C. Standard of Review

To the extent Buyers' contentions on appeal involve questions of law, we review the issues presented de novo. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799.) We review Buyer's challenges to the court's factual findings for sufficiency of the evidence. (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632.)

## D. Buyers Were Not Entitled to Rescission Simply Upon Request

Buyers argue that once the trial court determined that they were victims of a misrepresentation, it should have respected their choice to rescind the contract.[7] They contend the court erred when it refused to adopt the remedy they preferred and imposed a damages remedy instead. They argue that the court was required to respect their preference for rescission as a matter of law. And they assert that the questions of when

---

 [7] Buyers argue that, while they did not foreclose their right to request damages, they made their preference for rescission clear throughout the case. Buyers cite: (1) their counsel's argument on the first day of trial that Buyers never abandoned their request for rescission and that it has always been one of the theories of their case; (2) their counsel's statement on the ninth day of trial that they had not yet made an election between rescission and damages; (3) their request for rescission after the court issued its statement of decision; and (4) their counsel's argument at the hearing on their post-trial motions. Contrary to Buyers' assertion, the record does not support the conclusion that Buyers stated a *preference* for rescission throughout the case. At the most, it suggests Buyers wanted to keep the option of rescission available as the trial unfolded.

17

and how a plaintiff may elect remedies and the court's role in that process is "surprisingly unsettled."

As for the questions of when and how, Buyers cite one case that says that the plaintiff must elect between alternative inconsistent remedies before judgment (*Lenard*, *supra*, 151 Cal.App.2d at p. 768) and two cases that say the plaintiff may make such an election until satisfaction of judgment, or application of res judicata or estoppel, vindicates one of the inconsistent rights (*Southern Christian Leadership Conference v. Al Malaikah Auditorium Co*. (1991) 230 Cal.App.3d 207, 223 (*SCLC*); *Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 759 (*Fassberg*).)

We need not determine the question of when the injured party must elect between inconsistent remedies. The court did not hold that Buyers could not obtain rescission because their election of that remedy was untimely or barred by res judicata or satisfaction of judgment. Instead, it held that rescission was not available because Buyers did not meet the procedural requirements for rescission since they could not restore the consideration they had received, namely the house. The court also held that their rescission claim was barred by laches, a different concern from the timing of their election between rescission and damages.

As for the court's role, Buyers cite cases that suggest that the choice of remedies belongs to the plaintiff (*Lenard*, *supra*, 151 Cal.App.2d at p. 768; *SCLC*, *supra*, 230 Cal.App.3d at p. 223; & *Walters*, *supra*, 83 Cal.App.3d at p. 16 ["the choice of remedies lies with the wronged party, and not with the court"]) and cases that state that the choice of remedy ultimately belongs to the court (*Akin*, *supra*, 140 Cal.App.4th at p. 297 ["even if the party seeks inconsistent remedies, it is the court ultimately who determines to which she is entitled"]; *Tanforan v. Tanforan* (1916) 173 Cal. 270, 273-274 (*Tanforan*); *Crogan v. Metz* (1956) 47 Cal.2d 398, 403 (*Crogan*).) In *Tanforan*, which was decided in 1916, the Supreme Court held that the trial court erred when it forced the plaintiff to elect

18

between inconsistent theories at trial, before the defendant put on his case.  The court stated that the plaintiff may introduce evidence on each of his or her causes of action and "the election or . . . decision as to which of them is sustained" is a matter for the trier of fact.  (*Tanforan*, at pp. 273-274.)  And 40 years later, in *Crogan*, the Supreme Court stated that if the plaintiff makes no election and is not otherwise estopped, the election as to which cause of action is sustained belongs to the trier of fact.  (*Crogan*, at p. 403.)

Buyers rely on the statement in *Walters, supra,* 83 Cal.App.3d 1, 16 that "the choice of remedies lies with the wronged party, and not with the court," and argue that once they "made it clear that they preferred rescission," the court could not refuse to grant rescission and impose a damages remedy instead.  As we shall explain, Buyer's reliance on this language from *Walters* is misplaced.

The defendant sellers in *Walters* owned six parcels of land, one of which included a house.  They sold one of the parcels, which they thought included the house, to the plaintiff buyer.  After the sale, the buyer learned that only a small portion of the house was on the parcel he had purchased.  (*Walters*, *supra,* 83 Cal.App.3d. at pp. 13-15.)  The buyer sued the sellers, the realtors, the lenders, and the title insurer for rescission, breach of contract, fraud, negligence, and other claims; several defendants filed cross-complaints.  (*Id.* at p. 11.)  At trial, the jury awarded the buyer damages for negligent misrepresentation against all of the defendants.  (*Id.* at p. 12.)  On appeal, the defendants challenged the trial court's order denying their motion to restrict the trial to damages based on rescission, which was based on the contention that the buyer had made a binding election of rescission when the sellers accepted his notice of rescission, as well as their argument that the buyer should be compelled to make an early election of remedies at trial.  (*Id.* at p. 15.)  The appellate court concluded that substantial evidence supported the trial court's finding that the buyer had not made a binding election of remedies because the sellers had not accepted the buyer's notice of rescission.  (*Id.* at pp. 15-16.)  The court explained, "A party who attempts to rescind a contract, but does so

19

ineffectively, does not lose his right to maintain an action for damages based upon its affirmance. [Citation.] Such a party may, in the same action, seek rescission or, alternatively, damages based upon contract in the event rescission cannot be obtained. 'There is no good reason why the plaintiff in such an action should be compelled to make an election between those remedies during the course of the trial, and such a rule would be contrary to fundamental principles of law.' [Citation.] As [the buyer's] attempt to rescind the contract was ineffectual, the trial court properly refused to restrict the trial to consequential [(rescission)] damages, or to compel an election of remedies early in trial." (*Walters*, at p. 16, citing *Williams v. Marshall, supra,* 37 Cal.2d at p. 457.) The court also rejected the defendants' contention that the trial court should have restricted the buyer to rescission "because an award of damages does not resolve the problems of the parties." The court stated, "Upon discovery of the problem with his property, [the buyer] had an election of two inconsistent remedies: one to disaffirm the contract and rescind, and the other, to affirm the contract and sue for damages. [Citation.] *The choice of remedies lies with the wronged party, and not with the court.* [Citation.]" (*Walters*, at p. 16; italics added.)

Buyers rely on the italicized language from *Walters* quoted above to support their contention that the court was bound by their election of rescission as their remedy. But this language must be read in light of Supreme Court authority, which provides that although the plaintiff may allege inconsistent theories (rescission and damages) and present evidence on each theory at trial, "the election or . . . decision as to which of them is sustained" is a matter for the trier of fact. (*Tanforan*, 173 Cal. at pp. 273-274.) To the extent that it is inconsistent with *Tanforan*, we disagree with the court's conclusion in *Walters* that "the choice of remedies lies with the wronged party, and not with the court."

This case is also factually distinguishable from *Walters*. In *Walters*, the court found that since the buyer's pretrial attempt to rescind was ineffective, he had not made a binding election before trial and could not be compelled to elect until the case was

20

submitted to the jury. (*Walters*, *supra*, 83 Cal.App.3d at pp. 15-16.) Thus, at the conclusion of the trial in *Walters*, both remedies were still available to the buyer. The italicized language from *Walters* that Buyers rely on may have been an acknowledgement of that fact. In contrast, in this case, the court found that the remedy of rescission was not available to Buyers because of defenses asserted by Sellers, but that Buyers could still recover damages for Sellers' negligent misrepresentations. Since rescission was not available, there was only one remedy available to Buyers (damages for negligent misrepresentation) and no election to be made.

Buyers assert that the cases that say the trier of fact may choose the remedy involved "situations where the choice of remedy depends upon a choice between inconsistent facts." But the trial court concluded that rescission was not available to them, based on its factual findings that they could not restore the property after the house went into foreclosure and that the claim was barred by laches. Thus, the court found that Buyers could not state a cause of action for rescission.

Buyers also argue that the trial court erred when it imposed the damages remedy on them, notwithstanding their testimony that if they had known about the defects, they would have investigated and would not have bought the house in the first place. But at trial, it was up to the court to determine the credibility of the witness and the court said it did not believe Buyers' testimony on this point.

For these reasons, we reject Buyers' contention that the court was required to honor their request for rescission.

### E. Application of Exception to Restoration Requirement

Buyers argue that the court abused its discretion when it concluded that rescission was not available because it misunderstood the legal rules governing application of the "special circumstances" exception to the restoration requirement.

21

The trial court held that "[r]escission is not an available remedy because [Buyers] cannot restore the consideration received under the contract and because it is barred by laches. [¶] [Buyers] cannot restore the property to [Sellers] because through their voluntary actions in defaulting on the first trust deed loan, the property was sold to a third party in foreclosure." The court added that "the foreclosure was caused by [Buyers] defaulting on their loan and had nothing to do with Sellers' alleged misrepresentations." The court stated, "Additionally, it does not appear that defendants could be made whole by a credit for the selling price with appropriate adjustments because the market decreased significantly between the sale to [Buyers] and the foreclosure."

As we have noted, one of the procedural requirements for rescission is that the rescinding party "restore to the other party everything of value which he has received from him under the contract or offer to restore the same upon condition that the other party do likewise, . . . ." (§ 1691.) " 'There are exceptional cases where restoration, or an offer to restore before suit is brought, is not necessary,' " including " 'where, without any fault of the plaintiff, there have been peculiar complications which make it impossible for plaintiff to offer full restoration, although the circumstances are such that [the court] may by final decree fully adjust the equities between the parties.' " (*Carruth v. Fritch* (1950) 36 Cal.2d 426, 430 (*Carruth*), quoting *California Farm & Fruit Co. v. Schiappa-Pietra* (1907) 151 Cal. 732, 739 (*California Farm*) and citing cases applying this principle; *Kelley v. Owens* (1898) 120 Cal. 502, 511 (*Kelley*).)

Buyers seize upon the phrase "before suit is brought" in the cases that repeat this rule and argue that the court should evaluate the rescinding party's ability to restore as of the date that he or she offers to rescind and not as of the time of trial or any subsequent election to rescind. They assert that since they still owned the house and were able to restore "as early as August 1, 2007" (when their counsel sent a letter suggesting Sellers "consider the immediate repurchase of the home and [golf] membership") and "in any event no later than November 2007" (when they filed their complaint), the court erred

22

when it held that this case did not fall within the special circumstances exception to the restoration requirement and denied their claim for rescission. They argue that " '[s]pecial circumstances' are necessary to justify a recessionary remedy when the plaintiff cannot return the consideration received only if the plaintiff's voluntary act *prior to making an offer to rescind* has made return of the consideration impossible." Buyers assert the court was mistaken when it concluded that events that occurred after they offered to rescind were relevant to their right to rescission. They argue that if Sellers had accepted their demand in 2007, "neither party would have been exposed to the risks of a foreclosure sale. In other words, the court put the risk of the decline in value of the [house] after the demand for rescission on the party that was injured by the deception, to wit, Buyers."

Buyers devote almost eight pages of their opening brief to a discussion of cases that neither address this issue nor support their contention that the ability to restore must be evaluated as of the date the rescinding party first requests rescission. Some of the cases they cite contain broad, general statements regarding the extent of the court's equity jurisdiction or the power of the court upon granting rescission to adjust the equities between the parties if they cannot be returned to precisely the same positions they were in before entering into the contract. (See e.g., *Swan v. Talbot* (1907) 152 Cal. 142, 147 [no error where trial court found rescission impractical and awarded damages for an account stated]; *Snelson v. Ondulando Highlands Corp.* (1970) 5 Cal.App.3d 243, 258; *Connell v. Crawford* (1928) 92 Cal.App. 715, 719.) Other cases cited fail to support their contention altogether. (*Stock v. Meek* (1950) 35 Cal.2d 809, 814 [in determining whether appeal on cause of action for rescission was moot, court considered sale of property after entry of judgment]; *Dreiske v. Los Angeles Investment Securities Corp.* (1936) 13 Cal.App.2d 59, 63-64 [plaintiff could not state a cause of action for rescission because of loss of consideration due to voluntary act by plaintiff]; *Chamberlain v. Wakefield* (1949) 95 Cal.App.2d 280 [applies a different exception to the restoration requirement].) None of these cases aid Buyers.

23

Buyers read too much into the phrase "before suit is brought" in the case law. As we have noted, the Supreme Court has repeatedly stated that "[t]here are exceptional cases where restoration, or an offer to restore *before suit is brought*, is not necessary." (*Carruth*, *supra*, 36 Cal.2d at p. 430; *California Farm*, 151 Cal. at p. 739; *Kelley, supra,* 120 Cal. at p. 511.) This merely means that restoration or an offer to restore is a condition precedent to filing an action for rescission and to obtaining rescission. As the Supreme Court recently explained in *Village Northridge*, "section 1691 requires the party seeking rescission to give notice to the other party 'as to whom he rescinds,' and to restore all consideration or 'everything of value which he has received' under the contract. The statute's language is clear. With certain exceptions . . . , it generally requires that the rescinding party return any consideration received as a condition of rescission before judgment in the rescission action. As originally enacted, section 1691 did not make prelawsuit restoration an absolute condition of rescission, but instead required 'the use of . . . reasonable diligence' to restore or offer to restore any consideration received." (*Village Northridge*, *supra*, 50 Cal.4th at pp. 921-922.) The court noted, however, that "the rule requiring 'tender or return of consideration . . . is not inflexible.' " (*Id*. at p. 928, quoting *Carruth*, *supra*, 36 Cal.2d at p. 430.) The court explained that in 1961, the Legislature enacted section 1693 "to address any unfairness that the rescinding parties might face if they were insolvent or without funds to restore consideration prior to filing suit." (*Ibid.*) Thus, section 1693 permits plaintiffs who are unable to restore the consideration received "to delay restoration until final judgment consistent with equitable principles, including that defendants not be substantially prejudiced by the delay." (*Id.* at p. 929.)

Since a party may delay the election of rescission until at least a final judgment is entered and restoration may be delayed until final judgment, it makes no sense to evaluate the ability to restore as of the date rescission is first requested. In addition, the flexible nature of the restoration requirement militates against adopting the rigid rule that

24

Buyers advance. Nothing in section 1691 or the cases Buyers cite supports their argument that the court could only consider their acts up until the time they requested rescission in 2007 and that the court erred when it considered matters that occurred after that date in determining whether they were entitled to rescind.

Buyers did not make an irrevocable election of rescission any time before trial. In fact, even on the ninth day of trial, they were still undecided on the question whether to pursue rescission or damages. To obtain rescission, Buyers were required to restore the consideration they had received (the house) to Sellers. (§ 1691.) But they had lost the house to foreclosure in 2010. Buyers were therefore required to show that one of the exceptions to the restoration requirement applied. The only exception at issue provides that restoration, or an offer to restore, is not necessary, " 'where, *without any fault of the plaintiff*, there have been peculiar complications which make it impossible for plaintiff to offer full restoration, although the circumstances are such that [the court] may by final decree fully adjust the equities between the parties.' " (*Carruth*, *supra*, 36 Cal.2d at p. 430; italics added.) The trial court found this exception did not apply because Buyers were not without fault in the loss of the property because they stopped paying their mortgages in November 2007 and allowed the property to be lost to foreclosure. Substantial evidence supports that finding.

In addition, Buyers had an opportunity to cure the default in the fall and winter of 2009, when they received the proceeds of their settlement with the real estate defendants and Garza. At that time, there were more than sufficient funds to cure the default and avoid foreclosure on their mortgages and to pay for the repairs recommended by Fransen, the defense expert. In addition, Fransen testified that he was willing and able to make all of the repairs for $75,000. Instead, Buyers decided to use funds for other purposes. They did not repair the property and moved back to Wyoming.

It is also true that Buyers lived in the house for three years. They used the house as both their home and office, thereby saving the expense associated with maintaining a

25

separate office. They reaped the tax benefits attendant to owning the home and enjoyed the prestige of living in a large luxury home on a golf course. The last year they occupied the house, they lived there without paying a mortgage or rent. Their mortgage obligation was interest-only and they could therefore use the money that they would otherwise have paid toward principal for other purposes. Even if the court had concluded that Buyers were without fault in the loss of the house, Buyers do not point to any evidence of the value of the benefits they received from owning the home that would have allowed the court to balance the equities as part of an award of rescission. (*McCoy v. West* (1977) 70 Cal.App.3d 295, 301-302 [where there has been a rescission and restoration, guilty party is entitled to a credit for the value of the innocent party's use of the property].)

For these reasons, we conclude the trial court did not err when it found: (1) rescission was not available to Buyers because they were unable to restore the property; and (2) Buyers were not entitled to rely on the exception that applies when, *without any fault of the plaintiff*, there have been peculiar complications which make it impossible for plaintiff to offer full restoration and the court may in its final decree fully adjust the equities between the parties since Buyers were not without fault in the loss of the property to foreclosure.

## II. Laches

Buyers challenge the court's judgment on a second ground, arguing the court erred when it found that their rescission claim was barred by laches. The trial court found that Sellers "were prejudiced by the delay in [Buyers'] attempt to rescind because there had been a serious depression in the value of real property throughout the country, which depreciated the market value of the property involved in this case. The bankruptcy of the Pasadera Country Club and change in membership rules and equity value affected the value of homes in the subdivision."

26

Since we conclude the court did not err when it found that rescission was not available to Buyers because of their inability to restore the consideration received, we need not address Buyers alternative claim that the court erred when it held that "[l]aches also bars rescission."

### III.    *Negligent Misrepresentation Finding*

Buyers contend the judgment must be reversed because the "trial court failed to take into account that Sellers engaged in more than mere 'negligent misrepresentation.' " They assert that "[s]ince rescission is an equitable remedy, and since adjusting the equities requires a full consideration of the facts, the trial court's faulty conclusions with respect to the Sellers' negligence are relevant to the propriety of its choice of remedies as well.  The trial court simply ignored a serious issue concerning the actions of the Sellers' agent, Jacobs."  Buyers then proceed to reargue the evidence regarding the statements made by Jacobs.  Buyers assert that they were the victims "of what can *only* be described as *intentional* (even if innocently intended) misrepresentations" and that Sellers were liable for the actions of their agent.  They argue that the court's conclusion "that Sellers were liable only for negligent misrepresentation" cannot be affirmed and that the court "should be required to reconsider the remedy in light of Sellers' agent's intentional misconduct."

Sellers respond that any representations Jacobs may have made regarding the reason for the window repairs or regarding the home's wiring and Internet access are immaterial since the court found that the windows and electrical system were not defective.  We agree.

As for Jacobs's representation that water stains on the walls were caused by a sloppy maid, the court's statement of decision carefully reviews the legal rules governing both intentional and negligent misrepresentations.  It also contains a detailed analysis of the question whether Jacobs's statement regarding the maid was an intentional or a

27

negligent misrepresentation. In its analysis, the court describes the evidence presented and observes that while it is possible that Jacobs's statement was an intentional misrepresentation, "there are other inferences that are equally or more possible" that support the conclusion that there was no intentional misrepresentation. Accordingly, the court found Buyers did not meet their burden of proof on that claim. Given the court's detailed analysis of this question, we cannot agree that the court ignored Jacobs's statements. We therefore decline Buyers' request to remand this case to the trial court to reconsider the remedy in light of Jacobs's actions.

## DISPOSITION

The judgment is affirmed.

Márquez, J.

WE CONCUR:

Rushing, P. J.

Grover, J.