[L. A. No. 21141.   In Bank.   June 29, 1951.]

ROY O. WILLIAMS et al., Respondents, v. FRANK D. MARSHALL et al., Appellants.

446

Best, Best & Krieger, James H. Krieger, W. S. Andrus and Gerald Brown for Appellants.

Thompson & Colegate and Robert D. Allen for Respondents.

EDMONDS, J. — Roy and Marguerite Williams were awarded a money judgment in an action based upon asserted false representations made in connection with the purchase of real property from Frank D. and Grace Edna Marshall. The court also ordered that the contract of sale and note and a deed of trust be canceled. Upon the appeal from the judgment, the findings and judgment are attacked as having no evidentiary support.

The Marshalls owned and operated a 90-acre ranch in Hemet. Some of the land was planted to citrus fruits, walnuts and apricots; the balance was unimproved. The trees were irrigated with water supplied by a local company. The water right, represented by certificates appurtenant to the land, was for 56 acre feet or 215.36 miner's inches of water, each 30 days.

The Williamses, both doctors, resided in Arizona. They had previously purchased land in Hemet for investment purposes but neither of them was experienced in ranching or farming operations.

The record also shows that Harvey Steele, a real estate broker and the father of Mrs. Williams, obtained from the Marshalls a contract which, for 60 days, gave him the exclusive right to sell their property. This agreement, signed by Frank D. Marshall, read in part: "Property location: Park Hill District. Price $130,000. . . . Total acres: 56 in trees—90A. total—6A. cots, 3A. Placentias, 1A. grapefruit, 23 Valencias, 23 Navels." Then followed a statement as to the net return from crops for 1942 to 1945, followed by: "Water 2.00 Lake Hemet on 56A. Water any time, any amount."

According to Steele, Marshall told him that the ranch consisted of 56 acres in trees with 47 acres in citrus fruit, 6 acres in apricots, and the rest in walnuts, and that the ranch was entitled to "water any time, in any amount." When Steele brought a prospective buyer to the ranch, Marshall repeated that the property contained 56 acres in trees, 47 of which were citrus.

Three months after the expiration of the 60 days, Mrs. Williams was visiting her father in Hemet. She learned that the ranch was to be sold and her father introduced her to Marshall. She interrogated Marshall in regard to the data included in the agreement and, in particular, as to the quantity of citrus acreage, the water situation and the income and expenses of the property for the past years. Marshall verified the information stated in the listing agreement and assured her that there was ample water to satisfactorily irrigate the orchard.

Following this conversation, she and Marshall drove along the roads separating the various sections of the ranch, and she walked through one quarter of it. This was the only occasion upon which she visited the ranch until after the contract of sale had been executed.

While Mrs. Williams was in Hemet, her husband arrived. He read the data in the listing agreement and, in company of Steele, drove around the boundaries of the ranch. The following morning, he walked through one section of it and there met the Marshalls. Williams testified that this was the only visit he made to the ranch prior to the execution of the contract of sale.

After the Williamses returned to Arizona, they decided to purchase the ranch. By telephone, they requested Steele to arrange the escrow upon specified terms. The price was fixed at $123,500, including the crops. The escrow instructions which they signed included their agreement to pay $37,050 cash and to execute a promissory note for $86,450, to be secured by a deed of trust on the property.

The transaction was completed and the property conveyed to the Williames in July, 1946. In the following December, or in January, 1947, the Williamses suspected that there was a shortage in citrus acreage. In a letter to Marshall, dated January 19, 1947, Dr. Williams wrote: "It was our understanding that there were 56 acres of trees. Have been surveying the place off the best I could myself by the stepping-off method, and using the maps you gave us and there doesn't

seem to me that there is that amount, but I am sure it is not far short of it. If you can give us any additional data on this question, wish you would kindly do so." On January 25th, Marshall replied that he could do no more "than has been done," but made no specific reference to the claimed shortage in acreage.

From a study made of the area by an engineer, the Williamses learned that the acreage in citrus trees was less than 47 acres. On March 31st, Dr. Williams again wrote Marshall and said: "In my letter of the 19th, I expressed question as to the acreage, and asked you how you arrived at the figure of 47 acres of citrus (23 navel, 23 valencia and 1 grapefruit as per the signed listing in my possession). I had asked George [the Williamses' manager of the ranch], several months back, to have a survey estimating the acreage. I just received this information. He estimated 41 acres in citrus. If this is correct, your figure is 6 acres short of the real estate method of figuring (to the center of road). I do not question the sincerity of your representation that there were 47 acres, a difference of 6 acres, but am sure you would agree were you in my place, this is too much to pass over. I believe an adjustment of at least $2,000.00 an acre and interest on the same would be perfectly proper. Am paying the interest today, as figured by the bank, but under protest as to the exact amount."

Marshall's reply dated April 7th reviewed the transaction and told Dr. Williams that he "thoroughly explored the ranch; walked up and down every tree row; made notes of all the 'sick' trees; talked of the possibility of putting down a well; and finally, you came to the decision to purchase the property known as the 'Park Hill Ranch.'" Dr. Williams' request for an adjustment in price was rejected on the ground that the sale was of a ranch and not of "so many trees."

Dr. Williams, by a letter of April 10th, summarized his position as follows: "Your statement that you were 'selling Park Hill Ranch as a ranch and not so many trees' is the crux of the problem. When purchasing the ranch we felt that we were purchasing so many trees which make the value to the Park Hill Ranch. It was a great disappointment to us to receive a preliminary appraisal of a number of acres about 6 acres short of the 47 that had been represented to us."

Receiving no reply to this letter, Dr. Williams again, on April 15th, complained of the discrepancy in acreage and said: "This makes the cost per acre, I have been told, the highest anyone has paid in the valley. You will admit that cost per acre is a common method of figuring the relative value of citrus acreage. These are points one weighs when making a purchase, and came in for my consideration at the time of making my own decision to buy. I trust you will weigh this matter carefully. If I am in the wrong in any detail, I shall be very happy to be convinced. If not, I am sure your desire is to do the right thing." Marshall did not reply and on May 5th, Dr. Williams wrote: "From our last correspondence it seems that we had arrived at an impasse in our views on the subject of acreage."

In May, the Marshalls left California for a vacation in Canada. Upon their return in October, they received a letter written by Dr. Williams on September 23d, which read in part: "Mr. Steele was in Tucson visiting us last week and made us an offer for our equity in Park Hill which we feel is very fair. He is taking over the management beginning the first of the month and would doubtless interview you soon. We are liquidating our assets there in the valley, having changed our plans of moving over there. As you know, I interviewed Mr. Wood, our attorney in Riverside, over our misunderstanding in acreage. He very much wanted me to give him a free hand in this matter, but I settled with him, taking it out of his hands and paving the way for negotiating directly with you. Mr. Steele purchasing our equity, I imagine this will all be 'water over the dam.' The whole thing has been very regrettable and painful to us and has helped discourage us with the valley."

This was the last letter written by Dr. Williams and, to that time, the only complaint which had been made in regard to the representations concerning the ranch related to the asserted shortage in citrus acreage. However, in the summer of 1947 the Williamses discovered that they were unable to obtain any water from the water company for the month of August. No water was available from that source for the balance of the year or for the early part of the following year. They purchased water from nearby property owners having wells, but the amounts so obtained were insufficient to irrigate the trees. In an effort to augment this supply, they drilled a well upon the property at a cost of $10,000,

but obtained no water. The shortage of water continued and the citrus trees were severely damaged.

Although Dr. Williams did not mention the water situation to Marshall, Steele, who was then managing the ranch, complained about it. Marshall testified that in October, after he returned from Canada, he and Steele, acting for the Williamses, "were talking back and forth to see whether it would be possible to avoid litigation in the matter."

Steele's negotiations with Marshall continued until March, 1948, when Marshall agreed to see Mrs. Williams in an attempt to adjust their differences. This meeting did not occur and a notice of rescission, dated March 12, 1948, was served upon Marshall. On March 23d, Marshall wrote Dr. Williams expressing his surprise at receiving the notice of rescission because "The latest talk I had with you was a telephone conversation with your wife, in which it was mutually agreed we would get together and iron out our difficulties." The present action was filed shortly thereafter.

In addition to the foregoing facts, the record includes evidence that the true acreage in citrus trees was only 38.15, including 1.29 acres in the right-of-way owned by the county. It also appears that there were only 4 acres planted to apricots, and 2 of the 3 acres of walnut trees were in the public right-of-way.

Evidence was also presented tending to prove that, prior to the sale of the ranch, the Marshalls had endeavored to locate water upon the land but were informed that no water could be had. They did not give the Williamses this information. Marshall testified that there were times when the water supply had been insufficient for irrigation. He then had to purchase water from nearby wells but he did not tell the Williamses these facts. According to the testimony of an expert, the amount of water apportioned by the water company to the owner of 56 shares of stock would irrigate only 24 acres of citrus trees.

Upon this evidence, the trial court found: At the time the Marshalls made the statements and representations concerning the acreage and water supply, they knew them to be false. The statements were made for the express purpose of deceiving the Williamses and to induce them to purchase the property. Prior to the sale, the Williamses made no investigation or survey as to the citrus acreage or of the water supply available to the property. The falsity of the representations concerning the citrus trees was not discovered until March,

1947; the true situation concerning water came to light a few months later. The Williamses offered to restore everything of value they had received from the Marshalls upon condition that the money paid by them was returned, but the offer was refused.

Judgment was rendered against the Marshalls for $37,-668.64, the amount which had been paid upon the contract and trust deed. Three thousand two hundred fifty dollars was added for the expenses, in excess of profits, incurred by the Williamses for the care and protection of the property. The court also decreed that the contract of sale and the deed of trust be canceled.

Upon their appeal from the judgment, the Marshalls contend: (1) The evidence does not support the finding that the Williamses were without experience in farming citrus groves and had no knowledge of citrus groves in the Hemet Valley and of the available water supply. (2) The trial court failed to make a finding upon the issue of whether Steele was the agent of the Williamses and had knowledge of the conditions of the Marshall ranch which was imputed to his principals. (3) There is insufficient evidence to sustain the finding that the Marshalls made fraudulent representations as to the acreage in citrus trees and the water supply. (4) The trial court erred in finding that the Williamses were not guilty of laches, and failed to make a finding upon the issue of waiver. (5) The Williamses should have been compelled to elect either the remedy of rescission or damages.

In support of their position, the Marshalls point to evidence that the Williamses had lived in San Bernardino County for seven or eight years. They contend that the climatic conditions in that area are similar to those in the Hemet Valley. Other evidence relied upon is that the Williamses had once resided on an apple orchard for six months and, in 1944 and 1945, owned citrus properties in Hemet Valley which they visited.

However, this evidence is not conclusive. As explained by the Williamses, the ownership of the citrus ranches was for the purpose of investment and they did not manage the properties. They testified that they were unfamiliar with management of citrus groves and the water conditions in the Hemet Valley. In summary, although there is some conflict in the evidence regarding the knowledge of the Williamses, it was resolved in their favor.

■  The trial court made no express finding upon the issue concerning the status of Steele and his knowledge, if any, of citrus growing and water conditions. However, there is no material evidence to support such a finding, and under such circumstances a judgment will not be reversed for the failure to make one. (*New Blue Point Min. Co.* v. *Weissbein,* 198 Cal. 261 [244 P. 325, 45 A.L.R. 781].)

The Williamses admit that Steele had previously managed other property in the Hemet Valley for them, brought the Marshall ranch to their attention, and acted as their agent in opening the escrow. But there is no evidence, they maintain, that Steele was their agent or had any authority to act for them in the negotiations leading up to the purchase of the property. To the contrary, say the Williamses, they acted entirely for themselves in the negotiations. They declare that Steele's authority in connection with the escrow was limited to passing on to the escrow holder data for instructions embodying the terms which they stated to him after the completion of their negotiations with the Marshalls and their decision to purchase the ranch in reliance upon the representations made by the Marshalls. These conclusions are fully supported by the record.

The Marshalls assert that the evidence shows that they sold the ranch as a single unit for a stated sum and not on a measured representation of net acreage in citrus trees. Accordingly, they argue that the Williamses may not complain of any shortage in net acreage. ■  In essence, the contention is that the exact number of acres of citrus trees was not material to the contract of sale. However, there is sufficient evidence to the contrary to support the findings and judgment. In addition to the testimony of the Williamses concerning the representations made to them, Marshall testified that his method of determining the sales price for the ranch was the multiplication of the number of citrus acres by a given price per acre. Under these circumstances, it may hardly be said that the quantity of citrus acreage was not within the contemplation of the parties and of the essence of the contract.

■  It is contended that the Williamses had independent knowledge that there were only 35 acres of citrus trees and for that reason they may not rely upon the representation of the sellers. This argument is based upon the notation on the back of the listing, in the handwriting of Mrs. Williams, which reads: "Total trees 4,000 (90 to acre)." Marshall

argues that by simple computation, these figures equal approximately 44 acres in trees. By subtracting from this figure of 6 acres in apricots and the 3 acres in walnuts, there is a remainder of 35 acres in citrus trees. This figure, say the Marshalls, approximates the acreage which the trial court found had been conveyed to the Williamses.

The contention is without merit. Marshall denied that he told Mrs. Williams that there were a total of 4,000 trees on the ranch, or that there were 90 trees per acre, although Mrs. Williams testified that he gave her the information which she wrote down. This conversation, she declared, immediately followed Marshall's statements as to the number of acres planted to citrus trees. It is not clear whether he then referred to the number of trees of citrus fruit or to the number of trees of all kinds. However, there is no evidence that Mrs. Williams did not understand Marshall's statement to mean that there were 4,000 citrus trees on the ranch and this is consistent with other portions of their conversation. In further support of the findings is the testimony of the Williamses concerning their reliance upon the representation of Marshall as to there being 47 acres in citrus trees, and that they would not have purchased the ranch at the price asked had they known the true facts.

In connection with their argument, the Marshalls complain that the trial court erred in computing the acreage. They assert that, as shown by the record, the accepted method of computing acreage is to measure to the center of the adjoining streets. They also refer to the official subdivision map of the area which bears the notation "measurements and acreage given to the center of streets." Following this method, the Marshalls surveyed the ranch and found 43.17 acres of citrus trees.

The contention is based upon the premise that the evidence conclusively proves an established custom to compute citrus acreage by measuring to the center of streets bordering an orchard. On the contrary, the record shows a general practice to survey around the perimeter of a grove to a distance approximately 10 feet beyond the outside row of trees, thus including only the ground planted to trees and necessary for cultivation of the orchard. The Marshalls introduced evidence tending to prove that, in determining the boundary lines of the ranch and for tax purposes, it is usual to measure to the center of all adjoining streets. No claim is made that there was any misrepresentation as to the boundary lines of

the ranch or the total number of acres included within them. The controversy concerns the number of acres planted to citrus trees within those boundaries, and the evidence in that regard is uncontradicted.

The finding that the Williamses were not guilty of laches or unreasonable delay in rescinding is also attacked as having no evidentiary support. It is contended that by paying interest and principal on the trust deed, drilling a well, and failing to give a timely notice of rescission, the Williamses affirmed the contract and waived the right to rescind.

The courts have frequently declared that there is no artificial rule as to the lapse of time which will justify the application of the doctrine of laches. Each case must be determined upon the basis of its facts, and in the absence of a palpable abuse of discretion the trial court's finding upon the issue will not be disturbed upon appeal. (*Hunt* v. *L. M. Field, Inc.*, 202 Cal. 701, 705 [262 P. 730] ; *McDevitt* v. *Butte City Ranch*, 7 Cal. App.2d 252, 254 [46 P.2d 290].)

A vendee who has been defrauded by his vendor is entitled to a reasonable time to investigate the falsity of the representations and the time so consumed cannot be charged as unreasonable delay. (*Dunn* v. *Security-First Nat. Bank*, 131 Cal.App. 541 [21 P.2d 647].) Although in December, 1946, or January of the following year, the Williamses suspected that the ranch did not have 47 acres of citrus trees, they had no definite information in regard to the area. Marshall was immediately asked for information but none was obtained from him. Dr. Williams then ordered an investigation. This was completed in March, 1947. Maps of the area showed a shortage of approximately 6 acres. Dr. Williams informed Marshall of this fact by letter, and demanded an adjustment in the price of the property. In the same letter Marshall was told that a payment then due upon the trust deed note would be made but under protest as to the amount. Marshall refused to make any concession as to the purchase price and did not reply to four other letters. The water shortage was not discovered until August, 1947, when the Marshalls were in Canada. Upon their return in October and until March, 1948, when the notice of rescission was served, Steele, then representing the Williamses and Marshall were, as stated by the latter in a letter to Dr. Williams, "talking back and forth to see whether it would be possible to avoid litigation in the matter."

The Marshalls argue that these facts do not support a finding that the Williamses were "lulled into inaction by their adversary," thereby excusing a delay of 15 months before serving a notice of rescission. Considering all the circumstances, it cannot be said the trial court's action was a palpable abuse of discretion entitling the appellants to a reversal of the judgment. The argument to the effect that the Williamses were given no hope for a settlement is refuted by the record. Just after the notice of rescission was served, Marshall wrote that he was greatly surprised because he thought that it had been "mutually agreed" that the parties "would get together and iron out our difficulties." This statement is certainly contrary to the present contention that there were no negotiations between the parties, and that Marshall did nothing to lull the Williamses into inaction. On the contrary, the evidence shows continuous negotiations concerning the shortage of acreage and of water from the dates when the falsity of the representations in regard to the amount of each of them was discovered until the service of the notice of rescission, which promptly followed the last conversation between the parties. ■ "Where a party protests promptly on discovering that he has been defrauded in making a contract, and enters into negotiations for a peaceable settlement, which fail, a complaint filed within a reasonable time after such failure is not barred by laches." (*Reiniger* v. *Hassell*, 216 Cal. 209, 210-211 [13 P.2d 737].)

■ As to the argument that the trial court erred in failing to make a specific finding upon the issue of waiver, "(T)he law is settled that waiver is an affirmative defense and a defendant relying thereon must set it up in his answer." (*Wood* v. *Jotham Bixby Co.*, 29 Cal.App.2d 294, 299 [84 P.2d 204]; *Wienke* v. *Smith*, 179 Cal. 220, 225 [176 P. 42].) Despite the contrary contention of the Marshalls, the second and third affirmative defenses of their answer disclose no such plea, with the possible exception of the following language: "Plaintiffs have delayed any right of rescission that they might have to the material prejudice of defendants, and by reason thereof plaintiff should not be allowed to deny the validity of said contract. . . ." Upon this pleading the trial court found that "It is not true that the plaintiffs have delayed their right of rescission to the material or any prejudice of the defendants. . . ." And in its last finding of fact, the trial court recited: "The Court having heretofore found in favor of the plaintiffs and against the defendants

on the issues of fraud and misrepresentation, rescission, laches and waiver. . . ."

At various stages of the trial, the Marshalls unsuccessfully moved the trial court to compel an election between the alternative remedies of rescission and damages. They argue that as a result of these erroneous rulings, they were compelled to defend upon both theories. ██ A defrauded vendee may, in the same action, seek rescission or damages in the event rescission cannot be obtained. (*Bancroft* v. *Woodward*, 183 Cal. 99 [190 P. 445].) There is no good reason why the plaintiff in such an action should be compelled to make an election between those remedies during the course of the trial, and such a rule would be contrary to fundamental principles of law.

The judgment is affirmed and the purported appeal from the order denying a new trial is dismissed.

Gibson, C. J., Shenk, J., Carter, J., and Traynor, J., concurred.

SCHAUER, J.—I dissent.

Section 1691 of the Civil Code provides that "Rescission, when not effected by consent, can be accomplished only by the use, on the part of the party rescinding, of *reasonable diligence* to comply with the following rules:

"1. He *must rescind promptly*, upon discovering the facts which entitled him to rescind, if he is free from duress, [etc.] . . ., and is aware of his right to rescind . . ." (Italics added.)

This rule is sound and the code section which declares it should not be, in effect, repealed by decisions such as that of the majority of this court in the present case.

Although the relief granted is said to be "a money judgment in an action based upon asserted false representations," it is in reality a decree permissible only in an equity suit[1];

---

[1]The opening paragraph of the majority opinion declares that "Roy and Marguerite Williams were awarded a money judgment in an action based upon asserted false representations made in connection with the purchase of real property from Frank D. and Grace Edna Marshall. The court also ordered that the contract of sale and note and a deed of trust be canceled." But on page 452 the actual facts (showing that the judgment is in truth a decree in equity enforcing rescission as distinguished from a judgment for damages in an action at law) appear;

it enforces a rescission and restores to the plaintiffs the sums paid to and for the benefit of the defendants. As appears from the majority opinion, the sale of the land in controversy was completed in July, 1946; the purchasers "suspected" a shortage of acreage in December, 1946, or January, 1947, and wrote to the vendors complaining of it on January 19, 1947; the purchasers knew of and spent $10,000 endeavoring to correct the water shortage in the summer of 1947; notice of rescission was not given until March, 1948.

The right to rescind is lost by delay. Diligence is "a condition of the right to rescind," and "There have been many cases in which delays for much shorter periods than a year have been held to be fatal to the right to rescind. [Citations.]" (*Clanton* v. *Clanton* (1942), 52 Cal.App.2d 550, 556 [126 P.2d 639]; see also *Campbell* v. *Title Guarantee & Trust Co.* (1932), 121 Cal.App. 374, 377 [9 P.2d 264], where it is said, quoting from *Schneider* v. *Henley* (1923), 61 Cal.App. 758, 763 [215 P. 1036], "it would appear that thirty days is about the utmost length of time which the courts are disposed to allow to the purchaser for rescission unless there are unusual circumstances in the case excusing longer delay"; *King* v. *Los Angeles County Fair Assn.* (1945), 70 Cal.App.2d 592, 596 [161 P.2d 468].)

No such unusual circumstances appear here. On the contrary, as stated in the majority opinion, vendor Marshall replied in January, 1947, to purchaser Williams' letter regarding a "suspected" shortage of acreage, that he could do no more "than has been done." Instead of exercising their right to rescind, the purchasers delayed for more than two months before communicating again with the vendors. Williams then again wrote to Marshall with reference to the shortage of acreage. It was only after the property in question had been seriously damaged that Steele, representing the Williamses, commenced negotiations with the Marshalls to determine whether litigation could be avoided. Certainly it cannot be said that Marshall "lulled [the Williamses] into inaction" by telling them, as soon as they reported to him their suspicion of fraud, that he could do no more "than has been done."

---

the more accurate statement there is: "Judgment was rendered against the Marshalls for $37,668.64, the amount which had been paid upon the contract and trust deed. $3,250.66 was added for the expenses, in excess of profits, incurred by the Williamses for the care and protection of the property. The court also decreed that the contract of sale and the deed of trust be canceled."

The judgment, resting as it does upon the theory of rescission and restitution, is as a matter of law contrary to the requirements of diligence and promptness set forth in section 1691 of the Civil Code, and is irreconcilably inconsistent with the many cases which have heretofore upheld the requirements of the statute. While a cause of action for damages might be made out, both the quoted statute and the cited cases demonstrate that the majority opinion enforcing restitution on rescission is untenable. Conformity to law requires a reversal of the judgment and a new trial.

Spence, J., concurred.

Reporter's Note: Upon written request, appellants' petition for a rehearing by the Supreme Court was withdrawn July 19, 1951.