Filed 5/26/15 Modified and Certified for Pub. 6/23/15 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| WAYSON WONG et al.,<br><br>      Plaintiffs and Appellants,<br>v.<br>IRA STOLER et al.,<br><br>      Defendants and Appellants. | A138270<br><br>(San Mateo County<br>Super. Ct. No. CIV498102) |

I.
INTRODUCTION

Wayson and Susanna Wong bought a hillside home in San Carlos for $2.35 million from Ira and Toby Stoler. Several months after they moved in, the Wongs discovered that they and 12 of their neighbors were connected to a private sewer system and were not directly serviced by the City's public system. Believing they had been deceived, they sued the Stolers and the real estate agents who brokered the sale alleging various causes of action, including rescission. After the Wongs settled their dispute with the real estate agents for $200,000, a court trial was held on the rescission claim only. Although the court found that the Stolers, with reckless disregard, made negligent misrepresentations to the Wongs, it declined to effectuate a rescission of the contract. Instead, it ordered the Stolers to be, for a limited time, indemnifiers to the Wongs for sewer maintenance and repair costs exceeding the $200,000 they obtained in their settlement with the agents.

1

On appeal, the Wongs contend that the trial court erred in denying rescission, ordering the alternative relief, and denying them attorney fees. The Stolers contend in a cross-appeal that the trial court erred in denying them attorney fees.

We reverse. We conclude that the trial court declined to effectuate a rescission of the contract based on incorrect justifications and that its alternative remedy failed to provide the Wongs with the complete relief to which they were entitled.

## II.
## BACKGROUND

### A. *The Property*

The home is located on Sudan Lane, a privately maintained road on the west side of San Carlos in the Los Vientos Highlands area. When the developers built the house and 12 others, they installed a private system to carry sewage from these properties to a connecting point with the City's public sewer on a downhill street. Some of the homes on the private system are on a nearby street, Best Court. To meet the connecting point, the private system runs approximately 1,000 feet down a steep, unstable hillside through a public open-space and watershed area. At the time the 13 homes were built, the City required the developers to form a homeowners' association to maintain, repair, and replace the private sewer lines. No formally incorporated or registered entity was ever formed to provide these functions.

References to the system are contained in two recorded documents entitled "Declaration Conditions, Covenants and Restrictions for Sewer Easements," (CC&Rs) which were recorded against the property in December 1987. The obligations of the subservient downhill properties and the liabilities of the easement holders are included in a "Cross-Easement Agreement" recorded in April 1984, and a first amendment recorded in December 1987. The recorded instruments, however, do not clearly attach the easements to the titles of the 13 properties served by the private system.

### B. *The Purchase and the Improvements*

The Wongs bought the property from the Stolers in May 2008 for $2.35 million. Before the close of escrow, the Stolers provided the Wongs with a transfer disclosure

2

statement completed in 2002 by the prior owners, an updated 2008 transfer disclosure statement, and a supplemental sellers' checklist. These combined documents represented to the Wongs that the property was connected to a public sewer system. And they failed to inform the Wongs about (1) any specifics related to "CC&Rs or other deed restrictions or obligations"; (2) any "Homeowners' Association [having] authority over" the property; (3) any "abatement or citations against" the property; (4) any "past or present blockage, backup, overflow or other failure" of the sewer lines or that they had ever been "snaked/rooted"; or (5) "any toxic or hazardous material leakages or spills within a half-mile" of the property.

In a roadside conversation, the parties directly discussed that Sudan Lane is a privately maintained road, and in a follow-up email Mr. Wong specifically asked "is there any homeowners' association here?" Mr. Stoler replied, "no."

After the close of escrow, the Wongs allowed the Stolers to rent the property back from them for a few months. The Wongs then took possession in July 2008. In mid-September 2008, the City sent a letter to the Stolers about a problem with the private sewer system, and it was forwarded by the postal service to their new address.[1] The Stolers returned the letter to the City. They also received an email from a former neighbor about the City's letter. Neither of these pieces of correspondence was forwarded to the Wongs.

After they moved in, the Wongs commenced an extensive remodeling project. Mr. Wong did some of the initial demolition work himself, but professional demolition began in early October 2008. The Wongs signed a contract with a general contractor in December 2008. The remodeling cost about $300,000, and it included reconfiguring the garage doors and remodeling the kitchen, a bathroom, and a bedroom closet.

---

[1]     At about the same time, the Wongs received a letter from the City regarding "Best Court Private Sewer Maintenance," which was addressed to someone else and concerned a different property. As the letter was not addressed to them and did not appear to concern their property, the Wongs entirely disregarded it.

*B.      Discovery of the Private Sewer System*

The Wongs first learned of the private sewer system around November 6, 2008, when they received an email from a neighbor discussing it. Unbeknownst to the Wongs, this neighbor had been the coordinator of an informal homeowners' association since 2005. By this time, much of the home was down to the studs as a result of the demolition work.

The Wongs tried to resolve the problem without involving the Stolers. They and other neighbors met with City and asked it to take possession of the sewer system. In April 2009, the City denied the request and instead proposed that the homeowners enter into a maintenance agreement. The Wongs also worked to no avail to establish a formal structure to oversee the system. When it became increasingly unlikely that their neighbors would come together to form a responsible entity or to enter into a maintenance agreement, the Wongs sought legal counsel.

*C.      Commencement of Litigation and Trial*

The Wongs sued the Stolers for negligence, negligent misrepresentation, fraudulent concealment, fraudulent misrepresentation, breach of contract, and breach of fiduciary duty. They also sought rescission of the purchase agreement.

Immediately before trial, the parties argued whether the case should be tried to a jury. The Wongs argued it should, and the Stolers argued it should not.[2] The trial court ruled that it would try the case "as a bench trial [on] the rescission claim . . . and then depending upon what I decide on that, then we'll see where we are as far as whether or not the remainder of the trial continue[s] on as a court trial or at that time whether we will need to empanel a jury and have a jury decide something."

At the ensuing trial, the evidence showed that the property owners on the private system never agreed to formalize an association, establish an emergency repair fund, or

---

[2]     On appeal, the Wongs do not challenge the trial court's denial of their request for a jury trial on their claim for rescission.

4

create a long-term reserve for the system's eventual replacement. It also showed that two sewage overflows occurred in 2008, and landslides damaged the pipes.

Experts for the Wongs testified that the 25-year old system has an expected useful life of 50 more years and is susceptible to damage from fire, erosion, landslides, and earthquakes. They testified that system failure is inevitable given the system's steep hillside location and existing tension cracks. According to the experts, the cost to replace two of the lines would be between $592,000 and $740,000.

Mr. Wong testified that he reviewed all the transaction materials given to him by the sellers, including the preliminary title report. He stated that the combination of the 2002 and 2008 transfer disclosure statements, together with Mr. Stoler's representation that there was no homeowners' association, misled him about the property's sewer service. He explained that he believed that the reference to a "CC& R/easement" in the preliminary title report pertained to a public sewer line running under the private road because he had been told that the property was on a public sewer and the 2002 transfer disclosure statement referenced CC&Rs solely in the context of the road and driveway.

The evidence established that the Stolers participated in forming an informal association—the Los Vientos Highlands Sewer Association—to pay for sewer maintenance. The Stolers contributed money to the association, and Mrs. Stoler was an initial signator on the association's bank account. Evidence was presented that the Stolers had, but failed to give the Wongs, a copy of the original cross-easement, which referenced the City's requirement that a homeowners' association be formed. Evidence was also presented that the Stolers failed to disclose they had received a letter from the City reminding them and the other owners about the obligation to form an association as "part of the privately owned and maintained sewage disposal system." This letter was actually a notice of abatement, and the evidence therefore showed that the Stolers knew that the private sewer system had leaked.

Mr. Stoler testified that he had made improvements costing approximately $100,000 to the new house he and his wife bought after selling the property to the Wongs. He believed that their new house had nonetheless decreased in value, but he did

5

not specify an amount. He also testified that the property sold to the Wongs was "quite different" from its condition at the time of sale. He testified that "[a] whole lot of landscaping, mature landscaping had been removed [from] around the driveway and some mature acacia trees had been removed and the eucalyptus tree umbrella . . . over the driveway area had been topped, cut off, trimmed." In addition, he testified that the garage had been "dramatically" changed, that some interior walls had been removed, various fixtures had been replaced, and that the kitchen configuration had been changed.

D.    *Statement of Decision*

The court found that the Stolers acted with reckless disregard in negligently misrepresenting the material facts about the true nature of the sewer system and the existence of the informal association loosely established to maintain it. The court further found that the misrepresentations affected the property's value and that the Wongs would not have bought the property if they had known about the private sewer system and the informal association.

Nonetheless, the court denied rescission because of the "practicality of unwinding the transaction" and because of the undue burden it would place on the Stolers. The court reasoned that the Stolers had purchased a new home over four years ago and had spent $100,000 in improving it, and the Wongs had spent $300,000 improving the property and had removed a significant amount of the original landscaping. The court determined that, given the "burden that rescission would place on the Stolers," rescission was neither a fair nor appropriate remedy.

Instead of granting rescission, the court fashioned alternative equitable relief in the form of declaratory relief and an equitable decree of indemnity. As to the declaratory relief, the court found that there is an "unincorporated association in existence through which the 13 owners must carry out the terms and conditions of the equitable servitudes set out in the CC&Rs," and the Wongs, as one of the 13 owners, are members of it. The court declared that pending any quiet-title action or agreement to make the sewer easements appurtenant to the 13 affected lots, the Wongs and the other 12 owners had an equitable servitude that ran with the land. But, recognizing that the other 12 owners were

6

not before the court, the court stated that it was only determining the rights and obligations as between the Wongs and the Stolers. Thus, the court declared that the Wongs "have only a 1/13th responsibility as to the Sudan Lane piece of the line."

As to the equitable decree of indemnity, the court ordered the Stolers to indemnify the Wongs for any repairs, maintenance, or replacement needs for a reasonable time not to exceed the sale of the property or 10 years, whichever occurred sooner. This obligation was capped at $360,000, which would be triggered only by the exhaustion of the $200,000 reflecting the settlement the Stolers received from the real estate agent.

Finally, the court declined to award punitive damages and deemed all other causes of action dismissed. As a consequence of the court's ruling, the non-rescission claims were never tried or resolved, much less by a jury as the Wongs had demanded.

E.      *Attorney Fees*

Each side filed motions for attorney fees. Finding neither party qualified as the "prevailing party," the court denied both motions. It explained: "[E]ach side here has achieved discernible, and equally substantial, major objectives that each had in the eventual outcome that each respectively sought in this litigation. [The Wongs] have recovered [i]ndemnity protection against the negligently undisclosed repair, maintenance, third party liability risks, and environmental injury risks arising from the shared ownership of the private sewer line servicing their house. At the same time, [the Stolers] have defeated the intentional fraud and deceit claims and have thereby avoided a rescission of their sale of the house to the Wongs, a rescission that would have been extremely disruptive given the changes in position of both [p]arties over the several years since the house was sold."

III.
DISCUSSION

A.    *The Appeal:  Rescission and Attorney Fees*

   1.    *Rescission*

      a.    Applicable Law and Standard of Review

A party to a contract has two different remedies when it has been injured by a breach of contract or fraud and lacks the ability or desire to keep the contract alive. (*Akin v. Certain Underwriters at Lloyd's London* (2006) 140 Cal.App.4th 291, 296 (*Akin*).)  The party may disaffirm the contract, treating it as rescinded, and recover damages resulting from the rescission.  (*Ibid.*)  Alternatively, the party may affirm the contract, treating it as repudiated, and recover damages for breach of contract or fraud. (*Ibid.*)

Rescission and damages are alternative remedies.  (*Akin, supra,* 140 Cal.App.4th at p. 296.)  A party may seek rescission or damages for breach of contract or fraud "in the event rescission cannot be obtained" in the same action.  (*Williams v. Marshall* (1951) 37 Cal.2d 445, 457 [defrauded vendee], citing *Bancroft v. Woodward* (1920) 183 Cal. 99; *Walters v. Marler* (1978) 83 Cal.App.3d 1, 16 [breach of contract], overruled on another ground in *Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 505-507.)  But "[t]he election of one remedy bars recovery under the other."  (*Akin,* at p. 296, citing *Alde v. Drudis* (1947) 30 Cal.2d 372, 383.)

Before 1961, California recognized two methods by which a party to a contract could obtain rescissionary relief:  (1) unilateral rescission, followed by an action to enforce the out-of-court rescission; or (2) an action for judicial rescission in which specific judicial relief is granted.  (*Runyan v. Pacific Air Industries, Inc.* (1970) 2 Cal.3d 304, 311-312 (*Runyan*).)  In 1961, however, the Legislature abolished the action to obtain judicial rescission and left only an action to obtain relief based on a party effecting rescission.  (*Id.* at p. 313; see also *Paularena v. Superior Court* (1965) 231 Cal.App.2d 906, 913.)

8

Consequently, any post-1961 rescission must necessarily be accomplished by a party to the contract. The court does not rescind contracts but only affords relief based on a party's rescission. Both the grounds for rescission and the means by which parties may rescind their contract are governed by statute. (See Civ. Code[3] § 1688, et seq.) Section 1689, subdivision (b)(1) permits rescission when "the consent [to the contract] of the party rescinding . . . was given by mistake[] or obtained through . . . fraud[] or undue influence[] exercised by . . . the party as to whom he rescinds."

The steps to rescind a contract are set forth in section 1691, which provides in part: "Subject to section 1693,[4] to effect a rescission a party to the contract must, promptly upon discovering the facts which entitle him to rescind . . . . [¶] (a) Give notice of rescission to the party as to whom he rescinds; and [¶] (b) Restore to the other party everything of value which he has received from him under the contract or offer to restore the same upon condition that the other party do likewise, unless the latter is unable or positively refuses to do so. [¶] When notice of rescission has not otherwise been given or an offer to restore the benefits received under the contract has not otherwise been made, the *service of a pleading in an action or proceeding that seeks relief based on rescission shall be deemed to be such notice or offer or both*." (Italics added.) Once a contract has been rescinded, any party to the disaffirmed contract may seek relief either by "bringing an action to recover any money or thing owing to him by any other party to the contract as a consequence of such rescission or for any other relief to which he may be entitled under the circumstances," or by asserting the rescission as a defense, counterclaim, or cross complaint. (§ 1692.)

Under section 1692, a trial court's obligation is not over once it has determined whether the section's substantive and procedural requirements have been satisfied. If the court finds that the contract was rescinded, "[t]he aggrieved party shall be awarded

---

[3]      All further undesignated statutory references are to the Civil Code.

[4]      Section 1693 provides that, as a general matter, delay in giving notice of rescission or in restoring benefits will not preclude relief based upon rescission absent substantial prejudice to the other party.

*complete relief*, including restitution of benefits, if any, conferred by him as a result of the transaction and any consequential damages to which he is entitled." (*Sharabianlou v. Karp* (2010) 181 Cal.App.4th 1133, 1144-1145 (*Sharabianlou*)), italics added.) If the trial court finds that "the contract has not been rescinded, [it] may grant any party to the action any other relief to which he may be entitled under the circumstances." (*Runyan*, *supra*, 2 Cal. 3 at p. 311, fn. 10.)

Thus, section 1692 " 'restates the equity jurisprudence applicable in the rescission context.' [Citation.] The fundamental principle underlying that jurisprudence 'is that "in such actions the court should do complete equity between the parties" and to that end "may grant any monetary relief necessary" to do so. [Citation.]' (*Runyan*[*, supra,*] 2 Cal.3d [at p.] 316.) Rescission is intended to restore the parties as nearly as possible to their former positions and ' "to bring about substantial justice by adjusting the equities between the parties" despite the fact that "the status quo cannot be exactly reproduced." ' [Citations.]" (*Sharabianlou, supra,* 181 Cal.App.4th at pp. 1144-1145.) "Rescission extinguishes the contract (. . . § 1688), terminates further liability, and restores the parties to their former positions by requiring them to return whatever consideration they have received. [Citation.] Thus, the '[r]elief given in rescission cases—restitution and in some cases consequential damages—puts the rescinding party in the *status quo ante*, returning him to his economic position before he entered the contract.' " (*Id.* at p. 1145.)

In rescission cases involving a real estate purchase, "the seller must refund all payments received in connection with the sale. [Citation.] If the buyer has taken possession of the property, the buyer must restore possession to the seller. [Citation.] Such recovery of the consideration exchanged is part of restitution. [Citations.] As consequential damages, rescinding buyers or sellers may recover such items as real estate commissions paid in connection with the sale [citation], escrow expenses [citation], interest on specific sums of money paid to the other party [citation], and attorney fees in appropriate cases [citation]." (*Sharabianlou, supra,* 181 Cal.App.4th at pp. 1145-1146, citing *Kent v. Clark* (1942) 20 Cal.2d 779, 784.) In some cases, the value of

10

improvements may also be recovered. (*Runyan, supra,* 2 Cal.3d at p. 315; *Lobdell v. Miller* (1952) 114 Cal.App.2d 328, 344.)

Whether to grant relief based on rescission "generally rests upon the sound discretion of the trial court exercised in accord with the facts and circumstances of the case [citations]." (*Hicks v. Clayton* (1977) 67 Cal.App.3d 251, 265; see also *Fairchild v. Raines* (1944) 24 Cal.2d 818, 826 ["the granting or withholding of equitable relief involves the exercise of judicial discretion"].) "However, that discretion is not an arbitrary one, but should be exercised in accord with the principles and precedents of equity jurisprudence." (*Hicks,* at p. 265.)

### b. Analysis

#### (1) The Purchase Agreement Was Rescinded

A straightforward application of the rescission statutes compels the conclusion that the purchase agreement was unilaterally rescinded by the Wongs. Their complaint expressly alleged numerous grounds entitling them to rescind the purchase agreement, including fraud and negligent misrepresentation, and it specifically sought relief based on rescission. By serving this complaint on the Stolers, the Wongs satisfied the procedural requirements of section 1691, i.e., they gave notice of rescission to the Stolers, and they subsequently offered to restore "everything of value" which they had received under the contract. (§ 1691, subd. (b).) At that point, the Wongs declared a unilateral rescission of the real estate contract under the clear language of the rescission statutes. " ' "[I]f facts exist that justify a rescission by one party, and he declares a rescission in some effectual manner, he terminates the contract." ' " (*Wilson v. Lewis* (1980) 106 Cal.App.3d 802, 809, quoting *Holmes v. Steele* (1969) 269 Cal.App.2d 675, 677; see *C. Norman Peterson Co. v. Container Corp. of America* (1985) 172 Cal.App.3d 628, 642-643 ["In rescission cases the Civil Code now prescribes the method by which *one* party may unilaterally rescind the contract on explicit notice to the other. (See . . .§ 1691.)"]; *Harrison v. Connecticut Mutual Life Ins. Co.* (N.D. Cal. 1991) 771 F.Supp. 1053, 1056 ["Where the procedural prerequisites of section 1691 are met, and there is a valid substantive ground for rescission, unilateral rescission occurs"].)

11

(2)     The Trial Court Abused its Discretion

In deciding whether to effectuate the Wongs' rescission, the trial court's first task under section 1689 was to determine whether the Wongs' consent to the contract "was given by mistake[] or obtained through . . . fraud[] or undue influence, exercised by . . . the party as to whom he rescinds." (§ 1689, subd. (b)(1))  If it was, the court's duty was to effectuate the rescission and to otherwise award "complete relief." (§ 1692.)  The Wongs argue that the trial court was required as a matter of law to have found their rescission effective because it found that they were the victims of misrepresentations, and they contend the court erred in awarding the alternative equitable relief.  For their part, the Stolers argue that section 1692, together with principles of equity, allowed the court to reject rescission and to award the alternative equitable relief.

We conclude that the trial court erred in declining to effectuate the Wongs' rescission and in basing its decision on the prejudice to the Stolers.  We further conclude that the trial court's alternative award was inadequate because it failed to satisfy section 1692's requirement that the relief be "complete."

We begin by rejecting the argument advanced by the Stolers that the Wongs' rescission could not have been effectuated by the trial court under section 1692 because the court did not find that the Stolers had engaged in actual fraud.  Under California law, negligent misrepresentation is a species of actual fraud and a form of deceit.  (See *Ventura County Nat. Bank v. Macker* (1996) 49 Cal.App.4th 1528, 1530; see also *Furla v. Jon Douglas Co.* (1998) 65 Cal.App.4th 1069, 1077 ["Negligent misrepresentation is a form of 'actual fraud,' consisting of '[t]he positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true,' " citing § 1572, subd. 2]; *Continental Airlines, Inc. v. McDonnell Douglas Corp.* (1989) 216 Cal.App.3d 388, 403 ["The case law, however, is clear that in California negligent misrepresentation is a form of fraud and deceit under §§ 1710, subd. 2, and 1572, subd 2"].)  Thus, "a single misstatement as to a material fact, knowingly made with intent to induce another into entering the contract, will, if believed and relied on by that other, afford a complete ground for rescission . . . .

12

[Citation.]" (*Stewart v. Crowley* (1931) 213 Cal. 694, 700.) Here, not only did the trial court find that the Stolers made misrepresentations, but it also found that these misrepresentations were made with reckless disregard. We conclude that these findings were sufficient to satisfy section 1692's substantive requirements.

We also conclude that the trial court's determination was based on a flawed justification. The trial court declined to effectuate the rescission because of the prejudice *to the sellers* and the complications of unwinding the years-old real estate transaction. We conclude that the first reason—the Stolers' prejudice—was an improper consideration, and we are unconvinced that the second one—the complications of unwinding the deal—is supported by the record.

First, the trial court should not have so heavily relied on the potential harm rescission would cause the Stolers. "[W]here defendant has been guilty of fraudulent acts or conduct which have induced the agreement between him and the plaintiff, courts of equity are not so much concerned with decreeing that defendant receive back the identical property with which he parted in the transaction, as they are in declaring that his nefarious practices shall result in no damage to the plaintiff. Persons who attempt to secure profits by deceitful means may not confidently expect to receive special consideration from courts of equity. In such a case, as a result of the rescission by the court, *nothing is exacted from the plaintiff out of particular regard for the condition of the defendant.* If his fraudulent acts have resulted in disastrous financial consequences to himself, it is no one's fault but his own, and he must sustain the necessary inconveniences thereby entailed. [Citations.] Where it is possible to bring about substantial justice by adjusting the equities between the parties, the fact that the *status quo* cannot be exactly reproduced will not preclude the plaintiff from equitable relief. No matter what may be the complications or complexities, the powers of a court of equity are so broad as to adequately meet the exigencies of the case and render a decree which will justly determine the rights of the respective parties. [Citations.]" (*Arthur v. Graham* (1923) 64 Cal.App. 608, 612, first italics added; see also *Snelson v. Ondulando Highlands Corp.* (1970) 5 Cal.App.3d 243, 258 ["In an action predicated on fraud, the

13

fact that the parties cannot be restored to the exact *status quo ante* will not prevent a court of equity from granting rescission, especially in the light of section 1692"].)

Second, based on the record before us, the trial court appears to have been overly concerned with the complications of unwinding the transaction. We recognize that changes have been made to the property and years have transpired. But the changes in the property were commenced before the Wongs learned of the Stolers' misrepresentations, and much of the time that has elapsed has been due to the Stolers contesting the Wongs' rescission. As we discussed above, rescission involving a real estate purchase requires the seller to refund the payments received and requires the buyer to restore possession to the seller. (*Sharabianlou, supra,* 181 Cal.App.4th at pp. 1145-1146.) And consequential damages are allowed such as real estate commissions, escrow payments, interest on specific sums paid to the other party, and even the cost of improvements.[5] (*Ibid.*; see also *Runyan, supra,* 2 Cal.3d at p. 315.) Offsetting these amounts is the reasonable rental value of the property while the buyers possessed it. (*Ibid.*) While untangling the deal may not be easy, we are unaware of any insurmountable obstacles.

Thus, we remand the case to the trial court to effectuate the Wongs' rescission and to consider additional relief as appropriate.[6] In doing so, the court is to award "complete relief, including restitution of benefits, if any, conferred by [the Wongs] as a result of the

---

[5] In their opening brief, the Wongs indicate that they have conceded "that they would not seek to recover the value of improvements" they had made.

[6] In light of our decision to remand for a new remedy, we need not assess the alternative relief the trial court awarded the Wongs. Suffice it to say, we find no clear legal authority for it. The court awarded its equitable and declaratory relief "with reference to the prayer of the complaint." But the trial was only on rescission under section 1692. All other causes of action, including those seeking damages, were not tried. Furthermore, even if there was authority for the alternative award, the relief awarded was inadequate. Requiring the Wongs to accept the Stolers as temporary excess-indemnity insurers fell far short of redressing their injury. It left them with a property less valuable than was represented, with rights to only limited and unguaranteed indemnification, and with responsibilities for co-managing a private sewer system dependent on the cooperation of 12 other homeowners.

transaction and any consequential damages to which [the Wongs are] entitled." (§ 1689.) The trial court's goal under section 1692 in fashioning this remedy must be, to the extent possible, "to restore [the Wongs] to their *status quo ante*." (*Snelson v. Ondulando Highlands Corp., supra,* 5 Cal.App.3d at p. 258.)

### 2.    *Attorney Fees*

Because we reverse the relief awarded by the trial court, we must also reverse the portion of the judgment denying the Wongs their attorney fees. (*Sharabianlou, supra,* 181 Cal.App.4th at p. 1151.) On remand, the court shall consider whether the Wongs are entitled to attorney fees as part of the complete relief due to them under section 1692, but no attorney fees will be authorized under Civil Code section 1717 because the contract is rescinded. (See *Super 7 Motel Associates v. Wang* (1993) 16 Cal.App.4th 541, 550.)

### B.    *The Cross-Appeal:  Attorney Fees*

On cross-appeal, the Stolers argue that if the judgment is affirmed, we should reverse that portion of the judgment denying them their attorney fees and remand for the trial court to revisit the prevailing party issue. Because we reverse the judgment, the Stolers' cross-appeal is moot.

## IV.
## DISPOSITION

The judgment is reversed with directions for the trial court to take such action, including the taking of additional evidence if appropriate, and modify its findings, conclusions and judgment to conform to the views set forth in this opinion. The Wongs are entitled to their costs on appeal.

_____

Humes, P.J.

We concur:

_____

Margulies, J.

_____

Dondero, J.

16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| WAYSON WONG et al.,<br><br>        Plaintiffs and Appellants,<br><br>v.<br><br>IRA STOLER et al.,<br><br>        Defendants and Appellants. | A138270<br><br>(San Mateo County<br>Super. Ct. No. CIV498102)<br>ORDER GRANTING PUBLICATION,<br>MODIFYING OPINION,<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

BY THE COURT:

The opinion in the above-entitled matter filed on May 26, 2015, was not certified for publication in the Official Reports. After the court's review of requests under California Rules of Court, rule 8.1120, and good cause established under rule 8.1105, it is hereby ordered that the opinion should be published in the Official Reports.

The opinion is modified by striking the heading in section II, "*B. Discovery of the Private Sewer System,*" and replacing it with "*C. Discovery of the Private Sewer System.*" Subsequent headers in that section are to be changed accordingly.

The second sentence of the fourth paragraph of the new section II.E. of the opinion is modified by replacing the words "the Stolers" with the words "the Wongs."

Section III.A.2. of the opinion is modified by striking the second sentence and replacing it with "On remand, the court shall consider whether the Wongs are entitled to

1

attorney fees under the applicable law. (See Civ. Code §§ 1692, 1717; *Super 7 Motel Associates v. Wang* (1993) 16 Cal.App.4th 541, 550.)"

The modification does not change the appellate judgment. (Cal. Rules of Court, rule 8.264(c)(2).)

The petition for rehearing by plaintiffs and appellants Wayson Wong and Susanna Wong is denied. The petition for rehearing by defendants and appellants Ira Stoler and Toby Stoler is denied.

_____P.J.

2

Trial Court:                          San Mateo County Superior Court

Trial Judge:                         Honorable Gerald J. Buchwald

Counsel for Plaintiffs and           Alexander Michael Weyand, Weyand Law Firm
Appellants:

Counsel for Defendants and           Garry K. Cohen, Garthwohl, Rauch & Cohen; Gary
Appellants:                          Steven Garfinkle; Maria J. Garfinkle